FILED
United States Court of Appeals
Tenth Circuit

May 23, 2011

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

SHEVEL M. FOY,

Defendant - Appellant.

No. 09-3314

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D. Ct. No. 07-20168-JWL)**

---

Robert A. Ratliff, Mobile, Alabama, on the briefs, for Defendant-Appellant.

Barry R. Grissom, United States Attorney, and Terra D. Morehead, Assistant United States Attorney, District of Kansas, Kansas City, Kansas, on the brief, for Plaintiff-Appellee.

---

Before **O'BRIEN**, Circuit Judge, and **SEYMOUR** and **TACHA**, Senior Circuit Judges.

---

**TACHA**, Circuit Judge.

---

After examining the briefs and the appellate record, this three-judge panel has determined unanimously that oral argument would not be of material assistance in the determination of this appeal. See Fed. R. App. P. 34(a)(2); 10th

Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

In 2009, a jury found defendant-appellant Shevel Foy guilty of: (1) conspiring to manufacture, possess with intent to distribute, or to distribute cocaine base and/or cocaine in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(ii), (b)(1)(A)(iii), 846 and 18 U.S.C. § 2; and (2) attempting to possess with intent to distribute between 500 grams and less than five kilograms of cocaine in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(ii), 846 and 18 U.S.C. § 2. The district court imposed concurrent sentences of 360 months' imprisonment for each charge. Mr. Foy now appeals various aspects of his convictions and sentences. We take jurisdiction under 28 U.S.C. § 1291. We AFFIRM Mr. Foy's conviction and sentence for conspiracy, but we VACATE his conviction and sentence for criminal attempt due to improper venue.

## I. BACKGROUND

Mr. Foy's convictions stem from his participation in a vast conspiracy to distribute cocaine and cocaine base in and around Kansas City, Kansas and Kansas City, Missouri from January 2006 to November 2007. The Drug Enforcement Administration ("DEA") began investigating the conspiracy in 2006 at the request of the Leavenworth, Kansas police department. After attempting various traditional investigative techniques (e.g., surveillance, confidential informants, and search warrants) and finding them to be ineffective means of uncovering the size and scope of the conspiracy, federal law enforcement officers

decided to seek wiretaps.

By statute, before a law enforcement officer may submit a wiretap application to a federal judge, he must obtain authorization from a statutorily designated executive official or an executive official whom the Attorney General designates, and he must identify the authorizing official in the application. *See* 18 U.S.C. § 2516(1) (listing the executive officers who may authorize a wiretap application) and § 2518(1)(a) (requiring that all wiretap applications include "the identity of . . . the officer authorizing the application"). In this case, the investigating officers submitted multiple applications for wiretaps and for extensions of wiretaps on the phones of various suspected conspirators from August to October 2007. Each of these applications referenced an outdated Attorney General Order ("AG Order") delegating authority to the official who authorized the application. Nevertheless, each wiretap application was approved by the district judge considering it.

One of the telephones tapped by officers belonged to Mr. Foy's co-defendant, Monterial Wesley. The conversations intercepted from Mr. Wesley's phone revealed that he and Mr. Foy were partners in drug trafficking. For instance, officers intercepted conversations in which Mr. Foy and Mr. Wesley: (1) discussed pooling their money together to pay for large quantities of cocaine; (2) discussed how to resolve an $8,000 deficiency in their payments to their drug source, Thomas Humphrey; (3) coordinated the distribution of large amounts of

fronted drugs; and (4) discussed absconding with large amounts of fronted drugs. Additionally, while conducting surveillance, officers observed Mr. Foy at the scene of multiple drug transactions between Mr. Wesley and Mr. Humphrey.

Once officers identified Mr. Foy as a participant in the conspiracy, they set up a "pole camera" at his home in order to have twenty-four hour surveillance of his residence. On October 17, 2007, the camera captured an attempted burglary at Mr. Foy's home. When officers arrived at the scene to investigate the burglary, they observed a bullet hole in the front door and other bullet holes inside the home. Additionally, officers intercepted a conversation between Mr. Foy and Mr. Wesley shortly after the attempted burglary in which the two discussed whether any money had been taken.

On November 27, 2007, officers arrested Mr. Wesley while he was purchasing drugs from Mr. Humphrey at a car wash. The officers seized five kilograms of cocaine from Mr. Humphrey's vehicle, $2,294 from Mr. Wesley, and a firearm from Mr. Wesley's vehicle.

On February 1, 2008, Mr. Foy was charged along with twenty-three other individuals in a 39-count superceding indictment. Specifically, Mr. Foy was charged with: one count of conspiracy to manufacture, possess with intent to distribute, or to distribute cocaine base and/or cocaine in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(ii), (b)(1)(A)(iii), 846 and 18 U.S.C. § 2; three counts of attempting to possess with intent to distribute five kilograms or more of cocaine

- 4 -

in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(ii), 846 and 18 U.S.C. § 2; and one count of using a communication device to facilitate a drug trafficking offense in violation of 21 U.S.C. § 843(b).

Prior to trial, Mr. Foy filed a motion to suppress the evidence obtained from the wiretaps. Principally, he argued that the wiretaps should be suppressed because the officers incorrectly referenced the source of their authority to file the wiretap applications and because wiretaps were not necessary to uncover the size and scope of the conspiracy. The district court denied the motion, and at trial, much of the government's evidence against Mr. Foy consisted of the incriminating conversations obtained from the wiretaps. The jury ultimately found Mr. Foy guilty of the conspiracy and attempt charges, but it acquitted him of the charge of using a communication device to facilitate a drug transaction.

Shortly after his conviction, Mr. Foy filed a motion for a new trial and a motion for judgment of acquittal. In the motion for a new trial, Mr. Foy argued that one of the jurors brought extrinsic evidence into the jury deliberations which affected the verdict and prejudiced Mr. Foy. In the motion for judgment of acquittal, Mr. Foy argued that the government failed to establish that the District of Kansas was a proper venue for the prosecution of the charges against him. The district court denied Mr. Foy's motion for a new trial, denied his motion for judgment of acquittal with respect to the conspiracy charge and one of the attempt charges, but granted him acquittal on the other two attempt charges.

A Presentence Investigation Report ("PSR") was prepared which determined that Mr. Foy was accountable for at least 150 kilograms of cocaine, giving him a base offense level of thirty-eight. *See* United States Sentencing Guidelines ("U.S.S.G." or "guidelines") § 2D1.1(c)(1). The PSR then applied a two-level enhancement under U.S.S.G. § 2D1.1(b)(1) for possession of a firearm in connection with a drug trafficking offense. Combining the total offense level of forty with Mr. Foy's criminal history, which the PSR calculated to be category I, the PSR recommended a guidelines range of 292 to 365 months' imprisonment. After hearing further testimony regarding Mr. Foy's past drug trafficking activity, the district court adopted the PSR's findings and ultimately sentenced Mr. Foy to concurrent sentences of 360 months' imprisonment. This appeal followed.

## II. DISCUSSION

A.     Motion to Suppress

Mr. Foy first argues that the district court erred in denying his motion to suppress evidence obtained from the wiretaps. Specifically, he contends that the wiretap evidence should have been suppressed because: (1) the officers failed to properly establish authorization in their wiretap applications; and (2) the affidavits in support of the wiretaps did not establish necessity.

1.     *Misidentification of the Order Delegating Authority to Authorize Wiretap Applications*

As noted above, law enforcement officers must obtain authorization from

an executive official before submitting a wiretap application to a federal judge, and they must identify the authorizing official in the application itself. *See* 18 U.S.C. §§ 2516(1) and 2518(1)(a); *see also United States v. Iiland*, 254 F.3d 1264, 1267 (10th Cir. 2001) (setting forth the procedure for obtaining a wiretap order). The Attorney General may specially designate certain executive officials to authorize wiretap applications. 18 U.S.C. § 2516(1). When the Attorney General delegates the power to authorize wiretap applications via an AG Order, law enforcement officers reference the specific order in their wiretap applications.

Evidence obtained from a wiretap must be suppressed "if the disclosure of that information would be in violation of [the wiretap statutes]." *Id.* § 2515. Aggrieved persons may move to suppress such evidence when "the communication was unlawfully intercepted" or "the order of authorization or approval under which [the communication] was intercepted is insufficient on its face." *Id.* § 2518(10)(a)(i), (ii).[1]

Not all deficiencies in wiretap applications, however, warrant suppression. *See United States v. Chavez*, 416 U.S. 562, 574–75 (1974) (stating that not "every failure to comply fully with any requirement provided in Title III would render the interception of wire or oral communications 'unlawful'"); *cf. United States v.*

---

[1]Although Mr. Foy does not specify which provision of § 2518(10)(a) he is invoking in support of his argument for suppression, it is clear that he does not invoke provision (iii), which requires suppression when "the interception was not made in conformity with the order of authorization or approval."

*Radcliff*, 331 F.3d 1153, 1160 (10th Cir. 2003) (refusing to suppress evidence when deficiency in wiretap order "constituted a technical defect that did not undermine the purposes of the statute or prejudice [the] [d]efendant"). Rather, the critical inquiry is whether there has been a "failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device." *United States v. Giordano*, 416 U.S. 505, 527 (1974).

The government concedes that each wiretap application submitted in connection with this case referenced an outdated AG Order delegating power to the executive official who authorized the application. Indeed, the government readily acknowledges that each wiretap application referenced AG Order 2758-2005, which, unbeknownst to the officers submitting the applications, had been revoked and replaced by AG Order 2887-2007. Although the new order technically rendered AG Order 2758-2005 void, it did not revoke the authority to approve wiretap applications from any official who had been designated under the prior order. Rather, AG Order 2887-2007 expanded the list of executive officials empowered to authorize wiretap applications. Thus, although the wiretap applications misstated the source of the officers' authority to file them, they were all in fact authorized by an executive official with the power to do so.

In *Chavez*, the Supreme Court held that the "[f]ailure to correctly report the

- 8 -

identity of the person authorizing the [wiretap] application [] when in fact th[e] Attorney General has given the required preliminary approval to submit the application . . . does not warrant the suppression of evidence gathered pursuant to a court order resting upon the application." 416 U.S. at 571. In other words, when the executive official who actually authorized a wiretap application had the power to do so, a law enforcement officer's failure to correctly identify the official in the wiretap application does not require suppression. These are the circumstances of this case.[2] Indeed, the officers' reference to an outdated AG Order was merely a technical defect which did not subvert the primary purposes of the wiretap statute's authorization requirement. *See United States v. Jones*, 600 F.3d 847, 853 (7th Cir. 2010) (holding that DEA's reference to AG Order 2758-2005 rather than 2887-2007 was a "clerical error" which did not subvert the "reviewing functions required by Congress"). Accordingly, the district court correctly refused to suppress the wiretap evidence on this basis.

2. *Necessity*

All wiretap applications are subject to a necessity requirement which is "designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Kahn*, 415 U.S. 143, 153 n.12 (1974). Accordingly, every wiretap

---

[2]Mr. Foy does not argue that the executive official who in fact authorized the wiretap applications in this case was not empowered to do so.

application must include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). A district judge may not approve a wiretap unless he finds that the applying officers have met this standard. *Id*. § 2518(3)(c). Traditional investigative techniques include: (1) standard surveillance; (2) questioning and interrogating witnesses or suspects, including through the use of grand jury proceedings; (3) search warrants; (4) infiltration of criminal groups by confidential informants and undercover agents; (5) pen registers; and (6) trap and trace devices. *United States v. Cline*, 349 F.3d 1276, 1280 (10th Cir. 2003).

Although the necessity requirement is intended to ensure that wiretaps are not used in situations where traditional investigative techniques may achieve law enforcement purposes, we do not require investigating officers to "exhaust all other conceivable investigative procedures before resorting to wiretapping." *United States v. Zapata*, 546 F.3d 1179, 1185–86 (10th Cir. 2008) (quotations omitted). We do require, however, that officers explain the need for wiretaps with some degree of specificity. *See Cline*, 349 F.3d at 1280–81. Indeed, "[t]he [officers'] statements must be factual in nature and they must specifically relate to the individuals targeted by the wiretap." *Id*. at 1281.

"We review for an abuse of discretion a district court's determination that a wiretap was necessary." *United States v. Ramirez-Encarnacion*, 291 F.3d 1219,

1222 & n.1 (10th Cir. 2002).  "A defendant bears the burden of proving that a wiretap is invalid once it has been authorized."  *Id.*   If a defendant carries his burden by demonstrating that a wiretap was not necessary, we will suppress any evidence seized pursuant to the wiretap.  *Id.*

Mr. Foy contends that the wiretap evidence should have been suppressed because: (1) the officers' affidavits in support of their wiretap applications included generic information regarding the limitations of traditional investigative techniques; (2) the expressly stated objectives of the wiretaps—to uncover all of the sources of supply for the conspiracy, the locations of "stash houses," and the monies derived from the conspiracy—are so general that they could conceivably justify wiretaps in any drug conspiracy case; and (3) the affidavits actually established that the government's goals were being achieved without wiretaps.

We have fully reviewed the comprehensive affidavits submitted by the officers in support of their wiretap applications and find them entirely sufficient to support the district judge's conclusion that wiretaps were necessary.  Indeed, the affidavits address why each traditional investigative technique had either been ineffective in this particular case or why the officers believed such techniques would be ineffective or dangerous.  Furthermore, we have held on numerous occasions that the law enforcement goal of uncovering the size and scope of the conspiracy may justify the authorization of wiretaps.  *See Zapata*, 546 F.3d at 1187; *see also Ramirez-Encarnacion*, 291 F.3d at 1223 (affirming district court's

necessity determination when, despite the officers' use of traditional investigative techniques, "the identity of many of the conspirators and the full extent of the conspiracy remained unknown"); *United States v. Johnson*, 645 F.2d 865, 867 (10th Cir. 1981) (affirming district court's necessity determination and noting that "[t]he FBI was properly concerned [] with identifying all of the members of the conspiracy, as well as the precise nature and scope of the illegal activity").

For these reasons, the district judge did not abuse his discretion in concluding that the wiretaps sought in this case were necessary.

B.      Motion for Judgment of Acquittal

Mr. Foy next argues that the district court erroneously denied his motion for judgment of acquittal because: (1) there was insufficient evidence that he was engaged in a conspiracy; and (2) the District of Kansas was an improper venue for the prosecution of the charges against him.

1.      *Sufficiency of the Evidence*

In Mr. Foy's motion for a judgment of acquittal, he did not argue that the evidence of conspiracy was insufficient to sustain his conviction. Accordingly, we review his sufficiency of the evidence claim for plain error. *See United States v. Goode*, 483 F.3d 676, 681 (10th Cir. 2007). Under this standard, Mr. Foy must establish "(1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Flonnory*, 630 F.3d 1280, 1288 (10th Cir. 2011).

To obtain a conspiracy conviction, the government must prove: (1) an agreement by two or more persons to violate the law; (2) knowledge of the objectives of the conspiracy; (3) knowing and voluntary involvement in the conspiracy; and (4) interdependence among co-conspirators. *United States v. Hutchinson*, 573 F.3d 1011, 1035 (10th Cir. 2009). "[I]nterdependence exists where each co-conspirator's activities constituted essential and integral steps toward the realization of a common, illicit goal." *United States v. Edwards*, 69 F.3d 419, 431 (10th Cir. 1995) (quotations omitted). The interdependence element, however, does not require that the government prove "the coconspirators know the identities or details of each scheme or have connections with all other members of the conspiracy." *Id*. (quotations and alterations omitted).

Mr. Foy argues that, with the possible exception of Mr. Wesley, the government failed to demonstrate interdependence between himself and the other conspirators. With respect to his relationship with Mr. Wesley, Mr. Foy argues that they merely shared a common supplier, which is insufficient to establish interdependence. *See United States v. Caldwell*, 589 F.3d 1323, 1330 (10th Cir. 2009) ("[S]haring a common supplier, without more, does not demonstrate that two drug dealers are acting together for their shared mutual benefit.").

Mr. Foy is correct that the government presented little evidence that he had an interdependent relationship with any conspirator other than Mr. Wesley. Nevertheless, the government was not required to establish Mr. Foy's connection

to all other members of the conspiracy in order to show that his dealings constituted an essential or integral step toward the common goal of the conspiracy. *Edwards*, 69 F.3d at 431.

Furthermore, Mr. Foy greatly understates the nature of his relationship with Mr. Wesley. Indeed, the government presented a substantial amount of evidence suggesting that Mr. Foy and Mr. Wesley were partners in the drug trade. That evidence showed that Mr. Foy and Mr. Wesley regularly pooled their money together to purchase multiple-kilogram quantities of cocaine, treated their debts to their drug supplier as common debts, coordinated the distribution of large amounts of cocaine, and discussed taking a large amount of cocaine from their supplier without paying for it. From this wealth of evidence, it was reasonable for the jury to infer that Mr. Foy and Mr. Wesley were dependent upon each other in their drug trafficking endeavors. *See, e.g.*, *United States v. Fox*, 902 F.2d 1508, 1515 (10th Cir. 1990) (finding interdependence where defendants "pooled their money so that [they] could make large purchases at a favorable price"); *United States v. Edwards*, 69 F.3d 419, 431 (10th Cir. 1995) (same). The fact that Mr. Foy may not have known or dealt with all of the people with whom Mr. Wesley dealt does not necessarily preclude his conspiracy conviction.

For these reasons, there was sufficient evidence of interdependence to sustain Mr. Foy's conspiracy conviction. Mr. Foy's claim on appeal therefore fails the first prong of plain-error analysis.

2.     *Venue*

Mr. Foy also argues that he should have been granted a judgment of acquittal because the District of Kansas was an improper venue for the prosecution of both the conspiracy and attempt charges against him. Specifically, Mr. Foy contends that the government failed to produce any evidence that he personally committed an illegal act in the District of Kansas.

"[V]enue is a right of constitutional dimension, [which] has been characterized as an element of every crime." *United States v. Miller*, 111 F.3d 747, 749 (10th Cir. 1997). "Venue in federal criminal cases is an element of the prosecution's case which must be proved, unlike the other elements, by a preponderance of the evidence." *Id*. at 749–50 (quotations omitted). Although venue is a question of fact to be decided by the jury, "[w]hether there has been sufficient evidence to justify a finding on venue is a question of law for the court." *Id*. at 749 (quotations omitted).

Venue is generally proper "in a district where the offense was committed." Fed. R. Crim. P. 18; *see also* U.S. Const. art. III, § 2, cl. 3 ("The Trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed."); U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury *of the State and district wherein the crime shall have been committed*.") (emphasis added). When the crime charged is conspiracy, "venue as to prosecution of all members of

the conspiracy lies either in the jurisdiction in which the conspiratorial agreement was formed or in any jurisdiction in which an overt act in furtherance of the conspiracy was committed by any of the conspirators." *United States v. Rinke*, 778 F.2d 581, 584 (10th Cir. 1985).

There is no question that the government presented ample evidence that various members of the conspiracy committed overt acts in furtherance of the conspiracy in the District of Kansas. For example, the record demonstrates that Mr. Foy's co-defendants Mr. Wesley, Henry Grigsy, and Franklin Goodwin all resided in Leavenworth, Kansas, and that they regularly coordinated and/or conducted drug deals there. Accordingly, venue was proper in the District of Kansas with respect to the conspiracy charge against Mr. Foy.

With respect to the attempt charge, however, venue was improper. To obtain a conviction for attempt, the government must show that the defendant "possessed the requisite criminal intent, as well as the commission of an act which constitutes a substantial step towards commission of the substantive offense." *United States v. Ramirez*, 348 F.3d 1175, 1180 (10th Cir. 2003) (quotations omitted).

Our review of the record uncovers absolutely no evidence that Mr. Foy committed any act in the District of Kansas. In fact, the government does not argue that it ever presented such evidence. Rather, the government relies exclusively, as it and the district court did below, on *Mr. Wesley's* acts to

establish venue in Kansas for the attempt charge against Mr. Foy.

Indeed, in concluding that venue was proper in the District of Kansas for the attempt charge against Mr. Foy, the district court described a series of phone calls that were played for the jury in which Mr. Wesley coordinated a drug deal with Mr. Foy, Mr. Humphrey, and another co-conspirator from his home in Kansas.  As noted above, however, there was no evidence that Mr. Foy was in Kansas at the time this drug deal was being coordinated.  Nevertheless, the district court reasoned that "[b]ased on this series of phone calls, it is apparent that Mr. Wesley and Mr. Foy were arranging a drug deal with Mr. Humphrey, and Mr. Wesley and Mr. Foy began the offense in Kansas where *Mr. Wesley* was located when he was initially on the phone." (emphasis added).

While it was entirely proper for the district court to impute the acts of Mr. Wesley to Mr. Foy for the purposes of establishing venue for the conspiracy charge, the government does not cite a single case suggesting that such imputation is proper to establish venue for the attempt charge.[3]  Moreover, our

_____

[3]The government's exclusive reliance on *United States v. Muhammad*, 502 F.3d 646 (7th Cir. 2007) is misplaced.  In that case, the defendant himself arranged, from his home in Wisconsin, to travel to Arizona to purchase drugs that he planned to transport back to Wisconsin for distribution.  *Id*. at 648.  Although the drugs were obtained in Arizona and seized by law enforcement in Texas, the defendant was prosecuted in the Eastern District of Wisconsin.  *Id*. at 648–51.  The Seventh Circuit concluded that venue was proper in Wisconsin because the "criminal undertaking [] began in the Eastern District of Wisconsin, drew upon resources from the Eastern District of Wisconsin for supplemental support, and was, without any doubt, intended, from its very beginning, to have its sole effect in the Eastern District of Wisconsin."  *Id*. at 654.  *Muhammad* does not address the salient venue issue presented by this case: whether the acts of another may

- 17 -

independent research reveals that at least two of our sister circuits have specifically rejected this type of "venue by imputation" approach when, as is the case here, the crime charged does not require concerted activity. *See United States v. Kwong-Wah*, 924 F.2d 298, 302 (D.C. Cir. 1991) ("Criminal attempt, unlike conspiracy or aiding and abetting, is not a 'group' crime . . . If the government wishes to establish venue for an attempt in a district where the defendant did nothing but where the defendant's confederates committed criminal acts, it is required to argue and prove that the defendant specifically aided and abetted those acts and to request that the jury be instructed on the issue."); *see also United States v. Griffin*, 814 F.2d 806, 812 (1st Cir. 1987) ("The government has not [] pointed out any authority supporting the use of conspiracy venue analysis in crimes not requiring concerted activity, and we have uncovered none."). Because the government failed to establish that Mr. Foy committed any act which constitutes a substantial step toward the commission of the substantive offense in the District of Kansas, it failed to properly establish venue for the attempt charge. Accordingly, we vacate Mr. Foy's attempt conviction and the resultant sentence.

C.     Motion for a New Trial

        Mr. Foy next argues that he should have been granted a new trial due to one

---

be imputed to a criminal defendant for the purpose of establishing venue for a criminal attempt charge. Accordingly, *Muhammad* is inapposite.

juror's introduction of extrinsic evidence to the rest of the jury. Specifically, Mr. Foy argues that one juror conducted an experiment outside the deliberation room in which he timed himself retrieving items from the floorboard of his car, that the juror presented the results of this experiment to the rest of the jury, and that this information affected the jury's verdict.

"We review the denial of a motion for new trial based upon juror misconduct for an abuse of discretion." *United States v. Simpson*, 950 F.2d 1519, 1521 (10th Cir. 1991). "Whether a district court abused its discretion in denying the motion depends on whether there is a reasonable possibility the extraneous material may have affected the jury's verdict." *Id*.

In this case, once the district court was apprised of the juror's alleged misconduct, it questioned both the foreperson and the juror in question. From this questioning, it became apparent that the juror's extrinsic experiment related exclusively to a charge against Mr. Wesley—using and carrying a firearm during and in relation to a drug trafficking crime. Mr. Foy was not similarly charged with that firearms offense, and the jury did not return a verdict for that charge against Mr. Wesley.

Because the allegedly improper extrinsic evidence in this case did not even relate to a charge against Mr. Foy, we cannot conceive of how that evidence could have affected the jury's verdict against him. Indeed, it is not reasonably possible that the juror's experiment, which had nothing to do with the conspiracy and

attempt charges against Mr. Foy, would have affected the jury's consideration of the evidence relating to those charges. Accordingly, the district court did not abuse its discretion in denying Mr. Foy's motion for a new trial.

D.    Sentencing

Mr. Foy's final arguments on appeal relate to his sentence. He contends that the district court erred in calculating the drug quantity for which he could be held accountable and in applying a two-level firearm enhancement.

1.    *Drug Quantity*

The government must prove drug quantity by a preponderance of the evidence. *United States v. Coleman*, 7 F.3d 1500, 1504–05 (10th Cir. 1993). "Factual findings regarding drug quantities are reviewed for clear error and are reversed only if the district court's finding was without factual support in the record or we are left with the definite and firm conviction that a mistake has been made." *United States v. Dalton*, 409 F.3d 1247, 1251 (10th Cir. 2005) (quotations omitted). "When the actual drugs underlying a drug quantity determination are not seized, the trial court may rely upon an estimate to establish the defendant's guideline offense level so long as the information relied upon has some basis of support in the facts of the particular case and bears sufficient indicia of reliability." *Id.* (quotations omitted)

In calculating the drug quantity attributable to Mr. Foy, the district court relied on the trial testimony of Mr. Humphrey and the testimony of Cruz Santa-

Anna at the sentencing hearing. Specifically, the district court determined from Mr. Humphrey's testimony that, in 2007 alone, Mr. Humphrey sold at least five kilograms of cocaine to Mr. Wesley three times per month, and that the amounts attributable to Mr. Wesley over this time were also attributable to Mr. Foy. Extrapolating this fifteen-kilogram-per-month figure over the eleven months during which the conspiracy was ongoing in 2007, the district court determined that Mr. Humphrey's testimony alone was sufficient to hold Mr. Foy accountable for at least 150 kilograms of cocaine, which translates to a base offense level of thirty-eight. *See* U.S.S.G. § 2D1.1(c)(1).

Moreover, the district court also relied on Mr. Santa-Anna's testimony that he sold Mr. Foy approximately twenty kilograms of cocaine per month during 2006 and 2007. Noting that this testimony was also sufficient, by itself, to hold Mr. Foy accountable for at least 150 kilograms of cocaine, the district court determined that taken in conjunction with Mr. Humphrey's testimony, "one cannot fail to find that the quantity considerably exceeded 150 kilograms."

Mr. Foy first objects to the district court's drug quantity calculation on the grounds that he should not be held accountable for all of the drugs sold to Mr. Wesley during the course of the conspiracy. This argument is plainly without merit. Indeed, in calculating drug quantity, the district court may consider, "in the case of a jointly undertaken criminal activity . . ., all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal

activity." *Id.* § 1B1.3(a)(1)(B); *United States v. Tagore*, 158 F.3d 1124, 1128 (10th Cir. 1998) (concluding that under U.S.S.G. § 1B1.3(a)(1)(B), a defendant's sentence may be based on "both the conduct of the defendant *and* certain conduct of other participants in the criminal activity"). As discussed in Part II.B above, there was ample evidence that Mr. Foy could not only reasonably foresee Mr. Wesley's drug activity, but that he actively participated in that criminal activity.

Mr. Foy next argues that the district court erred in relying on Mr. Santa-Anna's testimony because: (1) Mr. Santa-Anna's testimony did not concern the charged conspiracy; and (2) Mr. Santa-Anna's testimony did not prove a specific drug quantity by a preponderance of the evidence. These arguments are also without merit and warrant little discussion. Indeed, it is well-established that "a sentencing court may look beyond the charges alleged in the indictment and may consider quantities of drugs not alleged in calculating a defendant's base offense level, provided the drugs were part of the same course of conduct or common scheme or plan as the offense of conviction." *United States v. Hamilton*, 587 F.3d 1199, 1221 (10th Cir. 2009) (alterations and quotations omitted). Mr. Santa-Anna's testimony supports the district court's determination that the drugs sold by him to Mr. Foy were part of the same course of conduct or common scheme or plan as the conspiracy, and Mr. Foy has presented nothing that leaves us with a definite and firm conviction that the district court was mistaken in this determination. Furthermore, Mr. Foy's contention that Mr. Santa-Anna's

testimony was too vague to warrant the district court's reliance is not supported by the record.

For these reasons, we conclude that the district court did not clearly err in calculating the drug quantity attributable to Mr. Foy.

2.    *Firearm Enhancement*

Section 2D1.1(b)(1) of the Guidelines provides for a two-level enhancement "[i]f a dangerous weapon (including a firearm) was possessed." The Application Notes explain that "[t]he enhancement should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." U.S.S.G. § 2D1.1, cmt. n.3; *see also United States v. Heckard*, 238 F.3d 1222, 1233 (10th Cir. 2001). The enhancement applies when a co-defendant possessed a firearm, so long as possession was reasonably foreseeable to the defendant. *See United States v. Underwood*, 938 F.2d 1086, 1090 (10th Cir. 1991) (holding that under §§ 1B1.3(a)(1)(B) and 2D1.1(b)(1), a defendant may be held accountable for reasonably foreseeable weapons possession by a co-defendant). *But see United States v. Goddard*, 929 F.2d 546, 548 (10th Cir. 1991) (approving of "reasonably foreseeable" approach but suggesting that foreseeability is not required in conspiracy cases).

The government bears the initial burden of showing possession by a preponderance of the evidence. *Heckard*, 238 F.3d at 1233. "The government's initial burden is met when it shows that a weapon was located near the general

location where at least part of a drug transaction occurred." *Id.* (quotations omitted). If the government meets its initial burden, the defendant must demonstrate that it is clearly improbable that the weapon was connected with the offense. *Id.*

In this case, it is undisputed that Mr. Wesley was arrested as he attempted to purchase five kilograms of cocaine and that officers seized a firearm from Mr. Wesley's vehicle at the time of his arrest. Thus, the government met its initial burden of establishing possession by a preponderance of the evidence. And Mr. Foy does not argue that it was clearly improbable that the firearm discovered in Mr. Wesley's vehicle was connected with the drug trafficking conspiracy, nor has he contested the district court's finding that it was "clearly foreseeable to Mr. Foy that weapons, guns in particular, were involved in this drug [conspiracy]." Rather, Mr. Foy contends solely that the government did not establish that he personally possessed a firearm. As noted above, however, Mr. Foy may be held accountable at sentencing for Mr. Wesley's firearm possession. *See Underwood*, 938 F.2d at 1090. Accordingly, the district court did not err in enhancing Mr. Foy's sentence pursuant to § 2D1.1(b)(1).

### III. CONCLUSION

For the foregoing reasons, we AFFIRM Mr. Foy's conviction and sentence with respect to the conspiracy charge. We VACATE, however, Mr. Foy's attempt

conviction and the resultant sentence due to the government's failure to properly establish venue for that charge.