FILED
United States Court of Appeals
Tenth Circuit

April 25, 2013

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

WILLIE F. FORD,

      Defendant-Appellant.

No. 12-3030
(D.C. No. 2:10-CR-20129-KHV-7)
(D. Kan.)

**ORDER AND JUDGMENT**[*]

Before **O'BRIEN**, **McKAY**, and **BALDOCK**, Circuit Judges.

A jury convicted defendant Willie F. Ford of (1) conspiracy to distribute and

possess with intent to distribute more than five kilograms of cocaine and more than

280 grams of cocaine base (crack), in violation of 21 U.S.C. §§ 841(a)(1),

(b)(1)(A)(ii), (b)(1)(A)(iii), and 846 (Count 1); (2) conspiracy to maintain a residence

for the purpose of distributing crack within 1,000 feet of a public secondary school,

in violation of 21 U.S.C. §§ 856(a)(1), 860(a), and 846, and 18 U.S.C. § 2 (Count 4);

---

[*]     After examining the briefs and appellate record, this panel has determined
unanimously to grant the parties' request for a decision on the briefs without oral
argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore
ordered submitted without oral argument. This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and collateral
estoppel. It may be cited, however, for its persuasive value consistent with
Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

(3) distribution of crack within 1,000 feet of a public secondary school, in violation of 21 U.S.C. §§ 841(a)(1), 860(a), and 18 U.S.C. § 2 (Count 5); and (4) use of a communication device to facilitate a drug trafficking offense, in violation of 21 U.S.C. § 843(b) and 18 U.S.C. § 2 (Count 12). Ford was sentenced to 420 months in prison. He appeals his conviction on Count 1 and challenges his sentence. We exercise jurisdiction under 28 U.S.C. § 1291 and affirm his convictions and sentence.

## I. Background

The evidence at trial established that Ford and others used three houses in Kansas City, Kansas, for selling and storing drugs. The main drug house, located at 2632 North 20th Street, known as "the Spot," sold drugs day and night. Drugs were also sold from two other houses near the Spot. In addition to the three houses used for selling drugs, Ford regularly stored drugs intended for sale at the Spot at his parents' house nearby. He brought drugs from his parents' house to the Spot numerous times at coconspirator Andrew Price's request.

Following an extensive investigation of the drug trafficking operation, on October 13, 2010, law-enforcement officials made coordinated arrests of the participants and searches of the houses used for selling drugs. As FBI agents entered the Spot, several coconspirators ran out the back door. Two of them carried firearms and three carried large amounts of cash. Ford was not among those arrested at the Spot. A search of the Spot produced video cameras and a monitor, 27.8 grams of crack, 79.8 grams of marijuana, an electronic scale, packaging materials, and cell

- 2 -

phones. Searches of the other drug houses also produced large amounts of cocaine and crack.

Ford was charged in a superseding indictment with conspiring to distribute and distributing cocaine and crack between August 29, 2007 and October 13, 2010, and other charges. He was indicted with seventeen others, and stood trial with codefendants Marcus L. Quinn and Mark A. Brooks pursuant to a second superseding indictment. Four other codefendants entered guilty pleas and testified at the trial: LaVaughn "Jason" Brown, Polly Smith, Adrian Melendez, and Daniel Cardenas Garcia.

The testimony of Brown and Smith established that the persons permitted to sell drugs from the Spot were part of an "inner circle" that included Ford. Although Antonio Quinn[1] was the main person who decided who could sell from the Spot, all members of the inner circle had some say in the matter. Brown testified that the inner-circle members were "all the same," meaning a buyer could get drugs from him or any of the others. R. Vol. 2 at 864-65. The inner circle contributed to pay the bills at the Spot. Some members of the conspiracy had regular jobs, but Ford did not.

Several witnesses placed Ford at the Spot on a regular, if not constant, basis. One witness testified that she had purchased crack from him more than 25 times. Several controlled drug buys were completed at the Spot; one of them from Ford.

---

[1] Three defendants with the surname of "Quinn" were charged in the superseding indictment. Marcus Quinn stood trial with Ford. All other references herein to "Quinn" are to Antonio Quinn.

The government's evidence included transcripts of numerous telephone calls between coconspirators recorded from wire intercepts on Quinn's telephone. During calls between Quinn and Ford, the two discussed other conspirators and the drug business. In particular, they used the conspiracy's code words, such as "two-door" and "four-door," to describe drug quantities. During one call, Ford advised Quinn that the "kick-in boys [meaning SWAT teams] have been riding," *id.* at 1276, and Quinn asked who was "up there," to which Ford responded by naming two other coconspirators, *id.* Furthermore, other coconspirators referred to Ford in phone calls discussing the drug trafficking organization.

Testifying coconspirator Adrian Melendez stated that he supplied cocaine to Quinn. He had observed Quinn hand to Ford cocaine that he had supplied to Quinn. Melendez saw Quinn give Ford cocaine "six, seven times." *Id.* at 1935. In addition, coconspirator Daniel Cardenas Garcia testified that Quinn told him that he supplied Ford cocaine, and that Quinn sometimes delayed paying Garcia because he was awaiting payment from others, including Ford, before paying Garcia.

Following a jury trial, Ford was convicted of the counts indicated above. A Presentence Investigation Report (PSIR) was prepared that established a base offense level of 38 under U.S.S.G § 2D1.1(c)(1) (2009) for an offense involving 4.5 kilograms or more of crack.[2] Two levels were added, pursuant to § 2D1.2(a)(1), because the drugs were sold from a protected location, and two additional levels were

---

[2]     The 2009 version of the Sentencing Guidelines was applied.

- 4 -

added, pursuant to § 2D1.1(b)(1), for possession of a firearm, for an adjusted offense level of 42. Because he was determined to be a career offender, his criminal history category was VI, resulting in an advisory sentencing range of 360 months to life imprisonment. Ford objected to the PSIR, challenging the drug quantity attributable to him and the firearm enhancement. The district court overruled his objections, adopted the PSIR, and sentenced him to 420 months on each of Counts 1, 4, and 5, and 96 months on Count 12, all to run concurrently.

On appeal, Ford argues that the evidence was insufficient to sustain his conviction for Count One, conspiracy to distribute and possess with intent to distribute cocaine and crack. He also challenges his sentence, arguing that the drug amounts attributed to him were higher than justified by the evidence and he should not have received a two-level enhancement for possessing a firearm.

## II. Analysis

### A. Sufficiency of Evidence on Count One, Conspiracy

Ford contends that the evidence proved only that he sold drugs from the Spot and the other houses. He asserts that he had a buyer-seller relationship with Quinn, but there was no evidence that he conspired with him or anyone else. He points out that there was only one controlled buy from him. He asserts that he sold his own drugs, set his own prices, and kept all of the profits. He discounts the telephone calls as showing only that he and Quinn talked about drugs, and claims that there was no

evidence to prove that the transactions they discussed occurred.  He says that the telephone calls show only a buyer-seller relationship between him and Quinn.

"We review sufficiency-of-the-evidence challenges de novo, considering both direct and circumstantial evidence, and all reasonable inferences therefrom, in the light most favorable to the government." *United States v. Acosta-Gallardo*, 656 F.3d 1109, 1123 (10th Cir.) (brackets and internal quotation marks omitted), *cert. denied*, 132 S. Ct. 540 (2011).  "Under this standard, we will not reverse a conviction unless no rational trier of fact could have reached the disputed verdict." *United States v. Pulido-Jacobo*, 377 F.3d 1124, 1129 (10th Cir. 2004) (brackets, ellipsis, and internal quotation marks omitted).  This court will not weigh the evidence or disturb the jury's credibility determinations. *Acosta-Gallardo*, 656 F.3d at 1123.  "The evidence is sufficient . . . if a reasonable jury could have found the defendant guilty beyond a reasonable doubt." *Id.*

"To obtain a conspiracy conviction, the government must prove:  (1) an agreement by two or more persons to violate the law; (2) knowledge of the objectives of the conspiracy; (3) knowing and voluntary involvement in the conspiracy; and (4) interdependence among co-conspirators." *United States v. Foy*, 641 F.3d 455, 465 (10th Cir.), *cert. denied*, 132 S. Ct. 467 (2011).  "Because secrecy and concealment are essential features of successful conspiracy, direct evidence of conspiracy is often hard to come by.  Therefore, conspiracy convictions may be based on circumstantial evidence, and the jury may infer conspiracy from the defendants'

conduct and other circumstantial evidence indicating coordination and concert of action." *United States v. Dazey*, 403 F.3d 1147, 1159 (10th Cir. 2005) (citation, brackets, and internal quotation marks omitted).

### 1. Agreement

"To prove an agreement, the government need not offer direct proof of an express agreement on the part of the defendant. Instead the agreement may be informal and may be inferred entirely from circumstantial evidence." *Pulido-Jacobo*, 377 F.3d at 1129 (internal quotation marks omitted). Moreover, "[a]n agreement may be inferred from the facts and circumstances of the case, including frequent contacts among the defendants and from their joint appearances at transactions and negotiations." *United States v. Sells*, 477 F.3d 1226, 1236 (10th Cir. 2007) (internal quotation marks omitted).

Here, the jury could reasonably have inferred the existence of an agreement from the evidence showing that (1) Ford was a member of the inner circle at the Spot; (2) no one could sell drugs from the Spot who was not approved by the inner circle; (3) Ford sold drugs from the Spot; (4) those who sold drugs from the Spot, including Ford, shared the household expenses; (5) Ford knew and used the code words of the conspiracy, *e.g.*, "two-door" and "four-door;" (6) he participated in monitoring security at the Spot, *e.g.* the "kick-in boys" conversation; and (7) a buyer could buy

from any of the inner circle, *e.g.*, they were "all the same."[3]  *Cf. United States v. Cornelius*, 696 F.3d 1307, 1319 (10th Cir. 2012) (holding evidence that defendant was a member of a street gang in which he was a leader "(giving him an insider presence and heightened decisionmaking power in the gang)" who repeatedly sold cocaine to other drug distributors was "sufficient to support an inference of both agreement and interdependency elements of a conspiracy").  Viewing the evidence in the light most favorable to the government, we conclude that there was sufficient evidence of an agreement.

## 2. Essential Objectives

"Under this element, the government must prove that the alleged conspirator had a general awareness of both the scope and the objective of the enterprise." *Pulido-Jacobo*, 377 F.3d at 1130 (internal quotation marks omitted).  Ford acknowledges that he sold illicit drugs from the Spot.  This, added to the evidence that he was generally found there selling drugs, he stored drugs for the drug trafficking operation at his parents' house, and his payment to Quinn was sometimes necessary for Quinn to pay the drug supplier, established that Ford was aware of the scope and objective of the enterprise.

---

[3]    Ford argues that this remark referred to the quality of the drugs, rather than the agreement among the coconspirators.  But the jury could reasonably interpret the testimony as referring to an agreement, rather than to drug quality.

### 3. Knowing and Voluntary Involvement

"The jury may presume that a defendant is a knowing participant in the conspiracy when he acts in furtherance of the objective of the conspiracy." *United States v. Johnson*, 42 F.3d 1312, 1319 (10th Cir. 1994) (brackets and internal quotation marks omitted). Again, Ford concedes that he sold drugs, thus demonstrating that he was a knowing participant. He acted in furtherance of the objective of the conspiracy by contributing to the expenses of the Spot, storing drugs at his parents' house, participating in security measures for the Spot, and pooling funds with Quinn to pay the drug supplier.

### 4. Interdependence

"Interdependence exists where each co-conspirator's activities constituted essential and integral steps toward the realization of a common, illicit goal." *Foy*, 641 F.3d at 465 (brackets and internal quotation marks omitted). "Circumstantial evidence alone is often sufficient to demonstrate interdependence; indeed it is often the only evidence available to the government." *United States v. Caldwell*, 589 F.3d 1323, 1329 (10th Cir. 2009). Furthermore, "in the profit-driven world of illicit drugs, the fact that several individuals are in an economically symbiotic relationship may demonstrate that transactions among them are in pursuit of mutual benefit." *Id.* at 1332.

The government sufficiently established interdependence in this case by showing that (1) several coconspirators agreed on who could sell drugs at the Spot;

(2) they shared the house's expenses; (3) they shared information concerning security, such as monitoring SWAT activity and using code words to conceal references to drugs; (4) Quinn obtained drugs from Melendez and Garcia, and in turn supplied them to Ford whose payment was necessary to pay the purchase price; and (5) Ford stored drugs at his parents' house that he brought to the Spot when requested. *See, e.g. Cornelius*, 696 F.3d at 1319 (holding evidence that defendant was a member of a street gang in which he was a leader "(giving him an insider presence and heightened decisionmaking power in the gang)" who repeatedly sold cocaine to other drug distributors was "sufficient to support an inference of both agreement and interdependency elements of a conspiracy"); *Foy*, 641 F.3d at 466 (holding interdependence was shown by evidence that coconspirators "regularly pooled their money together to purchase multiple-kilogram quantities of cocaine, treated their debts to their drug supplier as common debts, coordinated the distribution of large amounts of cocaine, and discussed taking a large amount of cocaine from their supplier without paying for it"); *United States v. Hutchinson*, 573 F.3d 1011, 1036 (10th Cir. 2009) (holding evidence was sufficient to show interdependency between coconspirators where one coconspirator supplied the dealers in the drug house with drugs when they ran out, which was "plainly integral" to the operation's success). Thus, there was sufficient evidence to prove interdependence, as well as the other elements of a conspiracy, and Ford's conviction on Count 1 is affirmed.

**B. Sentencing Challenges**

Ford makes two challenges to his sentence. First, he contends that the amount of drugs attributed to him was too high and his sentence should have been based only on the amount of drugs linked directly to him, rather than the amount linked to the entire conspiracy. Second, he asserts that the district court erred in applying a two-level enhancement for possessing a firearm.

When "reviewing the district court's application of the sentencing guidelines, this court reviews legal questions de novo and reviews factual findings for clear error, giving due deference to the district court's application of the guidelines to the facts." *United States v. McKeighan*, 685 F.3d 956, 975 (10th Cir.) (internal quotation marks omitted), *cert. denied*, 133 S. Ct. 632 (2012). The district court's findings of fact are clearly erroneous if they are "without factual support in the record or if the appellate court, after reviewing all of the evidence, is left with a definite and firm conviction that a mistake has been made." *Id.* (internal quotation marks omitted). "We review a sentencing court's determination of drug quantity for clear error." *Caldwell*, 589 F.3d at 1333. "The government must prove drug quantity by a preponderance of the evidence." *Foy*, 641 F.3d at 468.

**1. Drug Quantities Ascribed to Ford for Sentencing Purposes**

"[I]n calculating drug quantity, the district court may consider, 'in the case of a jointly undertaken criminal activity, all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity.'" *Foy*, 641 F.3d

at 469 (ellipsis omitted) (quoting U.S.S.G. § 1B1.3(a)(1)(B)).  Ford argues that the drug quantities processed by the conspiracy were not foreseeable to him.  The district court determined that Ford was a "major player" in the drug conspiracy to be "held accountable for the reasonably foreseeable quantities of drugs trafficked by himself and his co-participants in furtherance of the jointly undertaken criminal activity[, all of which] occurred within the scope of his agreement to participate."  R. Vol. 2 at 3025.  Based on the evidence discussed above, we agree.

## 2.  Firearm Enhancement

Finally, Ford challenges the two-level enhancement for possessing a firearm.  This enhancement was based on the firearms thrown down by two of his fleeing coconspirators just prior to their arrest.  Section 2D1.1(b)(1) of the guidelines provides for a two-level enhancement "[i]f a dangerous weapon (including a firearm) was possessed."  "The [enhancement] should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense."  U.S.S.G. § 2D1.1, cmt. n.3.  "The enhancement applies when a co-defendant possessed a firearm, so long as possession was reasonably foreseeable to the defendant."  *Foy*, 641 F.3d at 470.  The initial burden is on the government to show possession by a preponderance of the evidence.  *Id.*

> The government's initial burden is met when it shows that a weapon was located near the general location where at least part of a drug transaction occurred.  If the government meets its initial burden, the defendant must demonstrate that it is clearly improbable that the weapon was connected with the offense.

*Foy*, 641 F.3d at 470 (citation and internal quotation marks omitted).

The government presented evidence that two of Ford's coconspirators possessed firearms and threw them down as they fled arresting officers. Thus, the government met its initial burden. Ford points out that there was no evidence that he possessed a firearm, but a defendant "may be held accountable at sentencing for [his coconspirator's] firearm possession." *Id.* Relying on *United States v. Moreira*, 333 F. App'x 366 (10th Cir. 2009), Ford contends that the government did not show that it was foreseeable that weapons would be present. His reliance is misplaced. There, as here, the firearm enhancement was appropriate because one or more coconspirators possessed the guns; the defendant had proprietary access to the drug house where the guns were possessed; the defendant participated in a large-scale drug conspiracy; and large amounts of drugs, drug paraphernalia, and cash were found at the drug houses or in the possession of coconspirators. *See id.* at 371-72. We conclude that Ford failed to show that it was clearly improbable that the weapons possessed by his coconspirators were connected with the offense, and therefore the firearm enhancement was appropriate.

## III. Conclusion

Ford's convictions and sentence are affirmed.

Entered for the Court

Bobby R. Baldock
Circuit Judge

- 13 -