**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 22, 2011**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

  Plaintiff-Appellee,

v.

RODOLFO SANABRIA SANCHEZ,

  Defendant-Appellant.

No. 10-7041
(D.Ct. No. 6:09-CR-00037-RAW-1)
(E.D. Okla.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **MURPHY**, **BRORBY**, and **TYMKOVICH**, Circuit Judges.
_____

        After examining the briefs and appellate record, this panel has determined

unanimously that oral argument would not materially assist in the determination

of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is

therefore ordered submitted without oral argument.

        Appellant Rodolfo Sanabria Sanchez appeals his conviction for possession

with intent to distribute 500 grams or more of methamphetamine. He alleges the

_____

        [*] This order and judgment is not binding precedent except under the
doctrines of law of the case, *res judicata* and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

government's evidence did not support the jury's verdict he possessed and intended to distribute the methamphetamine found in his home.  He also challenges his 235-month sentence, arguing it is procedurally and substantively unreasonable and that the district court erred in denying him a downward variance based on the 18 U.S.C. § 3553(a) sentencing factors.  We exercise jurisdiction pursuant to 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291 and affirm Mr. Sanchez's conviction and sentence.

## I.  Factual Background

Testimony and other evidence provided by the government at trial established Mr. Sanchez became the subject of a narcotics investigation conducted by Arizona law enforcement and a Cherokee County, Oklahoma Drug Task Force (Oklahoma Task Force).  The investigation began in March 2009, after an Arizona highway patrol officer stopped Jason Bollen – an admitted drug user from California – and seized two pounds of methamphetamine wrapped in two heat-sealed plastic FoodSaver bags located in the gas tank of the vehicle he drove.  Following his arrest, Mr. Bollen agreed to cooperate with Arizona law enforcement and told them he was transporting the methamphetamine from a California supplier, Faustino Soto, who furnished him the car, to Mr. Sanchez in Oklahoma and that he previously made the trip transporting narcotics between them on at least three other occasions.

After Mr. Bollen agreed to cooperate, Arizona authorities transported him, his vehicle, and the methamphetamine to Cherokee County, Oklahoma, where agents with the Oklahoma Task Force took over the investigation. Mr. Bollen provided them information about his past deliveries to Mr. Sanchez and led them to his residence. Agents then obtained an anticipatory search warrant to be executed only on Mr. Bollen's delivery of the methamphetamine to Mr. Sanchez.

For the purpose of facilitating Mr. Bollen's drug delivery, agents resealed the bags of methamphetamine and put them back into the gas tank. They then equipped Mr. Bollen with an audio recording device, and shortly before noon on March 13, 2009, they and Mr. Bollen went to Mr. Sanchez's home. However, no delivery occurred because Mr. Sanchez was not there.

At that time, Mr. Bollen informed agents Mr. Sanchez also owned a ranch and took them to that property where they saw the maroon-colored Jeep Cherokee Mr. Bollen had previously described as Mr. Sanchez's vehicle. Again, no delivery occurred because Mr. Bollen feared altering the delivery location would cause Mr. Sanchez to question the change in their routine.

At approximately six p.m. the same day, Mr. Bollen and agents returned to Mr. Sanchez's residence. Mr. Bollen exited his vehicle and walked over to Mr.

Sanchez who was feeding his chickens. Sometime after Mr. Bollen entered the house, agents saw him return to his vehicle, get into the rear driver's side, emerge with a white plastic bag which contained the two bags of methamphetamine, and reenter the residence. Later, Mr. Bollen again exited the house, got back into his vehicle for a moment, and then went back into the house. Sometime thereafter, he exited the house and drove away. Within minutes after his departure, agents executed the search warrant and found Mr. Sanchez and his girlfriend inside. Mr. Bollen later testified Mr. Sanchez's girlfriend was present whenever he was there but left the room when he and Mr. Sanchez discussed money or drugs.

The audio recording played at trial revealed most of Mr. Bollen's conversation with Mr. Sanchez. During their conversation, Mr. Sanchez asked Mr. Bollen whether he had been there earlier and dropped a cigarette butt he found on the ground near the residence as well as whether he had been stopped or pulled over by law enforcement on his trip. He also asked several questions on when Mr. Bollen arrived in town and whether he made any stops during his trip.

An early conversation during the audio recording also revealed Mr. Bollen's desire to leave that evening to go back to California, but Mr. Sanchez asked whether he could wait until the next day. When Mr. Bollen said he could not, the following exchange ensued:

-4-

Mr. Sanchez:  Then you can't come back for the money later or what?

Mr. Bollen:  Oh, you mean take the ... shit out now and just come back in the morning maybe for the money?

Mr. Sanchez:  Yeah, that's what [] tell you.

Mr. Bollen:  Oh, okay.  Early in the morning though?  Can we do it early?

Mr. Sanchez:  No.

Mr. Bollen:  No?

Sanchez:  Late.  Always.

Mr. Bollen:  If that's what we have to do that's what we have to do you know, but.

Mr. Sanchez:  It's always like that.

Mr. Bollen:  Yeah, that's true.

Mr. Sanchez:  Or maybe you can come back and come back later for the money.  ...  Yeah, because you know, I don't have all the money.

Mr. Bollen:  Yeah, yeah.  I know how it goes, yeah.

Mr. Sanchez:  I have to do something tomorrow.

Supp. App. at 60-62.  Mr. Bollen later testified it was normal practice during his prior deliveries to Mr. Sanchez to wait a day or two for payment.

Following their conversation about the money, Mr. Bollen told Mr. Sanchez he was going to "go get the shit over there," which he later explained meant removing the methamphetamine from the gas tank.  The following conversation

-5-

ensued:

Mr. Bollen:  Have you got a couple of plastic bags?

Mr. Sanchez:  What?

Mr. Bollen:  A couple of plastic bags?

Mr. Sanchez:  You're gonna pick it up right now?

Mr. Bollen:  Yeah.

Mr. Sanchez:  You want me to put that (inaudible) right there okay?

Mr. Bollen:  Yeah, it's okay.  It's quick.

Mr. Sanchez:  Yeah?

Mr. Bollen:  I'm quicker than Guero, yeah.

Mr. Sanchez:  Don't forget to open ... the switch.

App. at 192; Supp. App. at 62-63.

At trial, Mr. Bollen explained when he said he was "quicker than Guero" he meant he could remove the drugs from the gas tank faster than someone they knew by the name of "Guero."  With respect to Mr. Sanchez's reference to "the switch," Mr. Bollen explained he was referring to depressurizing the gas tank by pulling the gas door handle and removing the cap before removing the bags of methamphetamine floating in the tank.  In order to remove the bags, Mr. Bollen testified he had to remove the back seat, fuel pump cover, and the fuel pump.  He also testified it took him ten to fifteen minutes to remove the methamphetamine

bags from the gas tank and that he placed the gas-laden bags into a clean white plastic bag Mr. Sanchez gave him; he then took it into the residence and placed it behind Mr. Sanchez's front door.

During the audio conversation, Mr. Sanchez also questioned Mr. Bollen about whether he was selling to someone else, to which Mr. Bollen explained he was too afraid to sell to anyone else. Mr. Bollen also testified he delivered a cell phone chip to Mr. Sanchez as provided by Mr. Soto. According to Mr. Bollen, he brought Mr. Sanchez a similar cell phone chip before, and the normal procedure was for Mr. Sanchez to get rid of his old cell phone chip when Mr. Bollen brought him a new one. The audio recording established the following conversation about the cell phone chip:

> Mr. Sanchez: You bring the ... chip or he send something?
>
> Mr. Bollen: [T]he chip. It's in the car. Let me go get it. Yeah, for the phone. ... He's supposed to call you ... he said today or tonight or tomorrow he's going to be calling you. Let me go grab it. ... I guess that's the number. He's supposed to call you either tonight or tomorrow. So I guess you're supposed to put that in your phone.
>
> Mr. Sanchez: This is in my phone?
>
> Mr. Bollen: Yeah.
>
> Mr. Sanchez: Okay.

Supp. App. at 70.

While discussing the cell phone chip, Mr. Sanchez also initiated a discussion regarding his concerns about having any phone conversations because of a friend who was "busted":

> Mr. Sanchez: Yeah, I don't wanna use this phone because, uh, about four months ago, five months ago ... my friend ... got busted and ... he was calling me on the phone. ... Not too much not too much and we don't talk shit.
>
> ....
>
> The day he was, uh, calling is not and I never talk nothin' about nothin'. Never.
>
> Mr. Bollen: Yeah, yeah, right.
>
> Mr. Sanchez: Never. So I take care of it now.
>
> Mr. Bollen: It's better safe than sorry. Yeah, you know.
>
> ....
>
> Mr. Sanchez: That's the reason this is second one you bring me.
>
> Mr. Bollen: Yeah, that's right. I did bring one once, yeah.
>
> ....
>
> Mr. Sanchez: If I use my friend's phone and then ... something happened, they gonna call .... They're gonna know it's this ... phone was connected with, uh, another phone and they tried to listen to the ... conversations on that phone and they can come and get me .... I told them bring me one every time you come, bring me one.
>
> Mr. Bollen: Yeah, that's better and why not.
>
> Mr. Sanchez: And I throw away this one.

Supp. App. at 72-76. Mr. Bollen later testified he went and got Mr. Sanchez the

cell chip from his vehicle, which explained his exiting the house a second time to go to his vehicle.

In addition to the audio recording, evidence obtained in executing the warrant corroborated the information Mr. Bollen gave to authorities as well as his testimony at trial. For instance, Mr. Bollen testified he routinely transported drug money from Mr. Sanchez back to Mr. Soto in California in heat-sealed bags and used Mr. Sanchez's vacuum sealing machine and bags to seal that money. During the search, agents discovered a FoodSaver – a vacuum heat-sealing machine – as well as plastic bags in Mr. Sanchez's kitchen. An agent also testified, based on his past enforcement experience, that these types of bags are used by drug dealers to transport drugs and money for the purpose of avoiding detection by law enforcement.

Mr. Bollen also told authorities that during a prior trip, in December, he left his telephone number on the back of a piece of paper on a weather guide he used on the trip; agents discovered the same piece of paper, found in a stack of bills on Mr. Sanchez's dining room table, which was dated December 25, 2008, and provided the weather for that day on the I-40 corridor, which included California and Oklahoma. Agents also found Mr. Bollen's telephone number written inside a notebook discovered in the residence.

Mr. Bollen also told agents he had seen a shotgun to the right side of Mr. Sanchez's front door on his previous trips to the house. When agents executed the warrant, they found the same shotgun, as later identified by Mr. Bollen, propped against the wall near the front door. On entering the residence, agents immediately noticed a strong odor of gasoline and found the bundles of methamphetamine in a white bag behind the front door. Various documents found in the home showed Mr. Sanchez lived in the residence as Mr. Bollen indicated, including Mr. Sanchez's passport, the notebook, utility bills in his name, and financial papers. Certain evidence also indicated Mr. Sanchez's girlfriend resided in the house.

With respect to the quantity of drugs he delivered, Mr. Bollen initially informed authorities he believed he was transporting two or two and one-half pounds of methamphetamine; similarly, a later field test indicated the packages contained approximately two pounds of methamphetamine and the subsequent laboratory test revealed they contained methamphetamine weighing 1.97 net pounds without packaging. Mr. Bollen also testified a typical drug addict like himself uses between a quarter gram to a gram of methamphetamine a day, and on previous trips, Mr. Sanchez gave him some of the methamphetamine he delivered, but only after Mr. Sanchez cut it with an unknown product to reduce the potency. In demonstrating the methamphetamine delivered to Mr. Sanchez was intended to

be "cut" with another product for distribution, rather than for personal use, a government criminalist testified the methamphetamine delivered to Mr. Sanchez was eighty-five percent pure and explained most street-level quantities ready for consumption are only thirty percent pure. While agents did not find any money in the residence, Mr. Bollen testified that on past occasions, Mr. Sanchez gave him between $35,000 and $40,000 for each delivery.

Following his arrest, a grand jury indicted Mr. Sanchez on one count of possession with intent to distribute methamphetamine in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A). Thereafter, Mr. Sanchez moved to suppress the evidence seized from the residence, alleging the search was illegal, in violation of his Fourth Amendment rights, because the warrant contained insufficient information for a search and Mr. Bollen's informant statements, contained in the affidavit supporting the warrant, lacked reliability. Following an evidentiary hearing, the district court denied Mr. Sanchez's motion to suppress.

At trial, the government presented witness testimony, the audio recording, and other physical evidence, including photographs taken on execution of the warrant. Mr. Sanchez did not testify or introduce witness testimony or any other evidence in his defense, but moved for a directed verdict at the close of the government's case, which the district court denied. At the conclusion of the trial,

the district court provided the jury with multiple jury instructions, including various instructions on the weight the jury should give testimony by an accomplice, informant, and drug abuser, advising the jurors to consider such testimony with caution and great care and not to convict Mr. Sanchez on unsupported testimony unless they believed such testimony beyond a reasonable doubt. It also instructed the jury that, in weighing such testimony, it should consider if it was affected by self-interest, an agreement with the government, interest in the outcome, or prejudice against the defendant. Following its deliberations, the jury found Mr. Sanchez guilty of possession with intent to distribute 500 grams or more of methamphetamine, and the district court sentenced him to 235 months imprisonment and sixty months supervised release.

## II. Discussion

### A. Conviction

#### 1. Issues on Appeal

Mr. Sanchez now appeals his conviction, claiming the government provided insufficient evidence to support a conviction for either possession or intent to distribute the methamphetamine and surmising "no reasonable juror could have found him guilty beyond a reasonable doubt." In support, he claims the audio tape of his conversation with Mr. Bollen is "clearly insufficient to establish either [his] possession of methamphetamine or his intent to distribute it" and that the

trial testimony of Mr. Bollen "lack[s] even a scintilla of credibility and reliability." While he fails to provide further discussion in support of his argument the tape recording did not support his conviction, Mr. Sanchez contends Mr. Bollen's testimony lacks credibility and reliability given the trial evidence established he: (1) is a long-term drug addict and trafficker; (2) who has drug debt; (3) is awaiting felony charges in Arizona as a result of the stop related to his transportation of the instant methamphetamine; (4) has prior convictions for forgery, attempted burglary, and possession of methamphetamine; and (5) admitted Arizona authorities promised him felony probation rather than jail time in exchange for his cooperation. He also suggests Mr. Bollen's statements and testimony are unreliable based on his: (1) denial he was transporting drugs when initially stopped; (2) contradictory statement Mr. Soto owned the vehicle he drove, even though Mr. Bollen testified he was the registered owner who paid for its liability insurance; and (3) misstatement to authorities, as contained in the warrant, he was transporting 2.5 pounds of methamphetamine when it was only 1.97 pounds.

In arguing he did not possess the methamphetamine, Mr. Sanchez acknowledges Mr. Bollen delivered the narcotics to the house but contends no evidence showed: (1) Mr. Bollen gave it directly to him or that he knew it was in the house; (2) the bags of methamphetamine contained Mr. Sanchez's

-13-

fingerprints; or (3) agents found other drugs in the house.[1]  He also points out

numerous documents recovered in the search belonged to other people, including

his girlfriend, thereby suggesting the methamphetamine was delivered to them

instead.

Even if sufficient evidence established he possessed the methamphetamine,

Mr. Sanchez contends no evidence established his intent to distribute it.  In

support, he points out the FoodSaver vacuum sealer and bags found in his kitchen

are normal household items used for storing things like fruit, which Mr. Bollen

testified he previously brought to Mr. Sanchez from California.  He also points

out agents did not find a product used to "cut" the methamphetamine for street

distribution in the house and no evidence established:  (1) his phone was ever

used to call Mr. Bollen; (2) a phone chip existed or was found in the search; (3) a

connection existed between himself and those in California involved with the

methamphetamine, including evidence of any wire transfers, phone records, or

receipts; or (4) he enjoyed a lifestyle consistent with the sale of

---

[1]  On appeal, Mr. Sanchez states Mr. Bollen testified he did not know whether Mr. Sanchez knew he placed the drugs in his residence and, in support, relies on two pages of the trial transcript.  However, the testimony to which he cites is not of Mr. Bollen but an agent who was not in the house at the time Mr. Bollen delivered the methamphetamine and who merely confirmed the bags of methamphetamine did not contain Mr. Sanchez's fingerprints.  However, as counsel suggests, the record does show Mr. Bollen testified Mr. Sanchez was in the bathroom when he placed the bags of methamphetamine behind the front door, and he did not know whether Mr. Sanchez knew that was where he placed them.

methamphetamine, including the possession of large sums of money. He also contends no evidence, including gas and hotel receipts or other records, established Mr. Bollen made prior deliveries to him.

## 2. Applicable Law

We review the sufficiency of the evidence to support a jury's verdict and the denial of a motion for judgment of acquittal de novo. *See United States v. Vigil*, 523 F.3d 1258, 1262 (10th Cir. 2008). "In conducting this review, ... we ask whether, taking the evidence – both direct and circumstantial, together with the reasonable inferences to be drawn therefrom – in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt." *United States v. Serrata*, 425 F.3d 886, 895 (10th Cir. 2005) (quotation marks omitted).

In making this inquiry, we do not "weigh conflicting evidence nor consider the credibility of witnesses," which is left to the jury, but "simply determine whether the evidence, if believed, would establish each element of the crime." *United States v. Delgado-Uribe*, 363 F.3d 1077, 1081 (10th Cir. 2004) (quotation marks and citation omitted). Thus, the testimony of a drug addict is a credibility issue to be resolved by the jury as the fact finder, *see United States v. Martinez*, 877 F.2d 1480, 1482 (10th Cir. 1989), and we have held even an accomplice's

"uncorroborated" testimony may be sufficient to sustain a conviction. *See United States v. Magallanez*, 408 F.3d 672, 682 (10th Cir. 2005). In addition, we have generally held jury instructions on the weight to be given in evaluating the testimony of drug addicts, informants and accomplices, and those granted immunity are sufficient to guide the jury in making such credibility determinations,[2] and we "presume jurors attend closely to the language of the instructions in a criminal case and follow the instructions given them." *United States v. Almaraz*, 306 F.3d 1031, 1037 (10th Cir. 2002).

In order for a jury to convict for the crime of possession with the intent to distribute methamphetamine under 21 U.S.C. § 841(a)(1), it must find the government established the defendant: (1) possessed a controlled substance; (2) knew he possessed a controlled substance; and (3) intended to distribute it. *See United States v. Harris*, 369 F.3d 1157, 1163 (10th Cir. 2004). Possession may be actual or constructive, and to prove possession the evidence must show the defendant "knowingly held ownership, dominion or control over the object and premises where the contraband was found." *Id.* (quotation marks omitted). When the location of narcotics is jointly occupied, "the government must present direct or circumstantial evidence to show some connection or nexus individually linking

---

[2] *Cf. United States v. Valdez*, 225 F.3d 1137, 1141 (10th Cir. 2000); *United States v. Cook*, 949 F.2d 289, 294-95 (10th Cir. 1991); *United States v. Smith*, 692 F.2d 658, 660-61 (10th Cir. 1982).

the defendant to the contraband." *United States v. Valadez-Gallegos*, 162 F.3d 1256, 1262 (10th Cir. 1998). This requires "some evidence supporting at least a plausible inference that the defendant had knowledge of and access to the ... contraband." *Id.* (quotation marks omitted).

In determining whether the evidence, if believed, "would establish each element of the crime," *Delgado-Uribe*, 363 F.3d at 1081, "we will not reverse a conviction ... unless no rational trier of fact could have reached the disputed verdict," *Serrata*, 425 F.3d at 895 (quotation marks omitted). "The evidence necessary to support a verdict need not conclusively exclude every other reasonable hypothesis and need not negate all possibilities except guilt. Instead, the evidence only has to reasonably support the jury's finding of guilt beyond a reasonable doubt." *Id.* (quotation marks omitted).

### 3. Analysis

Applying our standard of review and the applicable legal principles, it is clear the jury in this case credited Mr. Bollen's testimony even though they knew he was: (1) an accomplice to the trafficking crime; (2) the informant who led agents to Mr. Sanchez; and (3) an admitted drug addict, who received a plea bargain for his cooperation. The jury also credited his testimony even though it was instructed to consider it with caution and great care. They were also

-17-

instructed, in weighing Mr. Bollen's testimony, to consider if it was affected by an agreement with the government. We presume the jurors in this case followed these instructions when they found Mr. Sanchez guilty. In addition, even though Mr. Sanchez's counsel had an opportunity to cross-examine Mr. Bollen in an attempt to discredit his testimony, the jury nevertheless found his testimony credible.

Not only did the jury credit Mr. Bollen's testimony, which alone may have been sufficient for the jury's conviction, but it is clear other evidence contributed to its credibility finding, including the fact the information Mr. Bollen gave to authorities in advance of the search was accurate, including, but not limited to, information concerning where Mr. Sanchez's house and ranch were located, what type of vehicle he drove, and where his firearm was located. It is also evident the jury, in convicting Mr. Sanchez, relied on the audio recording, which fully corroborated Mr. Bollen's testimony he delivered the methamphetamine to him. More specifically, the recording establishes Mr. Sanchez was inordinately suspicious of Mr. Bollen's activities, including when he arrived in town, whether he had been at the residence earlier, if he was selling to anyone else, and if law enforcement had any interaction with him or might locate or bust him, as demonstrated by his comments about the risk of using cell phones and his desire to obtain a new cell phone chip from Mr. Bollen, assumably for the purpose of

-18-

avoiding detection. The recording also shows Mr. Sanchez knew Mr. Bollen was going to obtain something out of the vehicle's gas tank because he reminded him not to forget to open the switch for the purpose of depressurizing the tank and provided Mr. Bollen with a white plastic bag for him to retrieve the gas-laden bags. In addition, the strong odor of gas detected by agents as they entered the residence would lead a jury to presume Mr. Sanchez could also smell the same odor for the purpose of knowing Mr. Bollen placed the gas-laden bags of methamphetamine in his house. He also discussed with Mr. Bollen when he could obtain payment before leaving for California. Thus, the jury could reasonably conclude their conversation concerned the delivery of, and payment for, the methamphetamine Mr. Bollen removed from the vehicle and placed in his house, even if agents discovered no money or cell phone chip inside the residence, no records establishing Mr. Sanchez and Mr. Bollen ever communicated by phone, and none of Mr. Sanchez's fingerprints on the bags of methamphetamine.

The government's evidence also showed Mr. Sanchez constructively possessed the methamphetamine. Documentation found in the house showed Mr. Sanchez resided at the house, and even if others also resided there, the audio tape, together with Mr. Bollen's testimony, established a connection or nexus individually linking Mr Sanchez – not anyone else – to the contraband. Thus, when considering the audio recording, Mr. Bollen's testimony, and the other

evidence, it is clear a plausible inference existed Mr. Sanchez had knowledge of and access to the contraband for the purpose of the jury reasonably concluding he constructively possessed the methamphetamine.

While Mr. Sanchez contends the FoodSaver and bags are common household items, Mr. Bollen's testimony established he previously used them to seal the money he received from Mr. Sanchez for the purpose of avoiding detection by law enforcement. His testimony was corroborated by an agent who testified that vacuum-sealed plastic bags are commonly used for transporting drugs and money to avoid detection by law enforcement. Thus, while a FoodSaver machine may normally be intended for innocent kitchen use, the evidence necessary to support Mr. Sanchez's verdict did not need to negate such a possibility. Instead, the jury could reasonably conclude from all the evidence presented Mr. Sanchez used the FoodSaver machine and bags for activities involved in the distribution of methamphetamine.

In addition, Mr. Bollen testified Mr. Sanchez previously "cut" the pure methamphetamine for his use, and expert testimony established the 1.97 pounds of methamphetamine was eighty-five percent pure, leading to the expert's opinion it was intended to be cut for distribution and was of a quantity not likely to be intended for personal use. Agents also found the firearm behind Mr. Sanchez's

front door near the methamphetamine which, as the jury was instructed, is another factor from which one may infer intent to distribute contraband.[3]  Thus, based on the evidence presented, the jury could make a reasonable inference Mr. Sanchez not only possessed the methamphetamine, but intended to distribute it, regardless of whether agents found any other drugs or cutting products in the residence.

As to Mr. Sanchez's claim Mr. Bollen's statements and testimony lacked a "scintilla" of reliability, he bases it on the fact Mr. Bollen initially denied he was transporting drugs, gave contradictory statements as to the ownership and registration of the vehicle he drove, and misstated the amount of methamphetamine he believed he was transporting.  These few inconsistencies are overshadowed by the overwhelming evidence corroborating Mr. Bollen's statements and testimony, including the audio recording.  More importantly, the jury knew of these inconsistencies and nevertheless found Mr. Bollen's testimony credible.

Based on the direct and circumstantial evidence submitted to the jury, together with the reasonable inferences to be drawn therefrom, which we view in

_____

[3]  Certain items, including plastic bags or baggies and firearms, are commonly regarded as tools of the drug trade.  *See United States v. Burkley*, 513 F.3d 1183, 1189 (10th Cir. 2008); *United States v. Triana*, 477 F.3d 1189, 1195 (10th Cir. 2007).

the light most favorable to the government, it is clear a reasonable jury could find beyond a reasonable doubt that Mr. Sanchez possessed and intended to distribute methamphetamine. *See Serrata*, 425 F.3d at 895. Thus, the government provided sufficient evidence to prove the elements required to convict Mr. Sanchez of the crime charged. *See id.*

## B. Sentencing

### 1. Presentence Report and Hearing

Following Mr. Sanchez's conviction at trial, a probation officer prepared a presentence report calculating Mr. Sanchez's sentence under the applicable 2008 United States Sentencing Guidelines ("Guidelines" or "U.S.S.G."). The probation officer set the base offense level at 36, under U.S.S.G. § 2D1.1, based on the drug quantity attributable to Mr. Sanchez, which consisted of the 759.424 grams of methamphetamine seized from his home and another 2,721.6 grams of methamphetamine for the three other two-pound, or 907.2-gram, deliveries Mr. Bollen testified he previously made to Mr. Sanchez. The probation officer also added a two-level increase under U.S.S.G. § 2D1.1(b)(1) based on the fact a shotgun was found approximately five feet from the seized methamphetamine, for a total offense level of 38. A total offense level of 38, together with a criminal history category of I, resulted in a Guidelines range of 235 to 293 months imprisonment. The probation officer also determined no factors existed

warranting a departure under the Guidelines or a variance under the 18 U.S.C. § 3553(a) sentencing factors.

Prior to and at sentencing, Mr. Sanchez objected to the drug quantity used to calculate the Guidelines range and the two-level enhancement for possession of a dangerous weapon. He also moved for a downward variance from the Guidelines range on grounds he was a first-time offender and no evidence established he had not been gainfully employed, was a burden on society, was previously incarcerated, or exhibited violent behavior or extreme conduct.

The district court denied Mr. Sanchez's drug quantity objection, explaining it could approximate the quantity of methamphetamine based on relevant conduct because the amount seized did not reflect the prior two-pound deliveries he received from Mr. Bollen. It then found by a preponderance of the evidence Mr. Sanchez was accountable for possessing the 759.424 grams of methamphetamine seized by authorities, as well as 2,721.6 grams, consisting of 907.2 grams of methamphetamine for each of the three other deliveries Mr. Bollen made to him, for an offense level of 36, as recommended by the probation officer in calculating his Guidelines range. It also overruled Mr. Sanchez's objection to the probation officer's recommendation for a two-level increase under U.S.S.G. § 2D1.1(b)(1) for his possession of a firearm, for a total offense level of 38. In so doing, it

rejected Mr. Sanchez's argument the gun was unconnected to the offense charged.

At the conclusion of Mr. Sanchez's sentencing hearing, the district court imposed a sentence at the low end of the Guidelines range, of 235 months imprisonment and sixty months supervised release. In denying the requested variance, it explicitly stated it considered the parties' arguments, including Mr. Sanchez's objections and variance request, the presentence report, its authority to vary from the advisory Guidelines, and the sentencing factors in 18 U.S.C. § 3553(a). In discussing the § 3553(a) factors, the district court stated it considered the nature and circumstance of the offense and Mr. Sanchez's characteristics and criminal history, including his educational level, family responsibilities, employment history, and legal immigration status. It concluded a sentence of 235 months imprisonment would reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct, protect the public from Mr. Sanchez's future crimes, provide effective correctional treatment, and was "reasonable and sufficient, but not greater than necessary, to meet the objectives set forth in 18 [U.S.C. §] 3553(a)."

## 2. Issues on Appeal

On appeal, Mr. Sanchez contends the district court imposed a procedurally and substantively unreasonable sentence. He renews his argument his sentence is procedurally unreasonable because the district court overruled his objection to the application of U.S.S.G. § 2D1.1 with respect to the quantity of drugs used in calculating his offense level as well as the two-level increase for his possession of a firearm found in proximity to the methamphetamine. Mr. Sanchez contends the district court erred in denying his request for a downward variance and his sentencing is substantively unreasonable in light of his: (1) lack of formal education and training or vocational skills; (2) lack of prior criminal convictions or association with violent offenses; (3) desire for drug abuse treatment which he has never received; (4) large, close family including six children living in California with his ex-wife; (5) belief that deportation will have a drastic and lasting impact on his family; (6) gainful employment raising chickens and selling cars; and (7) legal, permanent immigrant resident status. In support, he refers to other circuit court cases which merely recognize a district court's discretion to "depart" downward from the Guidelines on grounds of cultural assimilation into American society and change of familial situation in the event of deportation.[4]

---

[4] Relying on *United States v. Castillo*, 386 F.3d 632 (5th Cir. 2004); *United States v. Lipman*, 133 F.3d 726 (9th Cir. 1998).

-25-

### 3. Legal Principles

We begin our discussion by clarifying that a sentence above or below the recommended Guidelines range based on an application of Chapters Four or Five of the Guidelines is referred to as a "departure," while a sentence above or below the recommended Guidelines range through application of the sentencing factors in 18 U.S.C. § 3553(a) is called a "variance." *United States v. Atencio*, 476 F.3d 1099, 1101 n.1 (10th Cir. 2007), *overruling on other grounds recognized by United States v. Kaufman*, 546 F.3d 1242, 1270 (10th Cir. 2008). While Mr. Sanchez uses the nomenclature downward "departure" in his appeal, the record on appeal demonstrates only that he relied on the 18 U.S.C. § 3553(a) factors, which are applied for a variance, in arguing the circumstances of his history and characteristics warranted a sentence below the Guidelines range.[5] We retain jurisdiction to review a sentence for reasonableness under the § 3553(a) factors, taking into account Mr. Sanchez's asserted grounds for departure when conducting a reasonableness review. *See United States v. Chavez-Diaz*, 444 F.3d 1223, 1229 (10th Cir. 2006).

---

[5] To the extent Mr. Sanchez did argue for a downward departure, we lack "jurisdiction ... to review a district court's discretionary decision to deny a motion for downward departure on the ground that a defendant's circumstances do not warrant the departure" ... "unless the court unambiguously states that it lacks such discretion," *United States v. Sierra-Castillo*, 405 F.3d 932, 936 (10th Cir. 2005), which does not appear to be the case here.

We review a sentence for reasonableness, giving deference to the district court under an abuse of discretion standard. *See United States v. Smart*, 518 F.3d 800, 802, 805-06 (10th Cir. 2008). "Our appellate review for reasonableness includes both a procedural component, encompassing the method by which a sentence was calculated, as well as a substantive component, which relates to the length of the resulting sentence." *Id.* at 803. In determining whether the district court properly applied the Guidelines in calculating the sentence, we review its legal conclusions de novo and its factual findings for clear error, *see United States v. Kristl*, 437 F.3d 1050, 1054 (10th Cir. 2006) (*per curiam*), including its determination on the quantity of drugs for which a defendant is held accountable under the Guidelines, *see United States v. Foy,* 641 F.3d 455, 2011 WL 1957680, at *9 (10th Cir. May 23, 2011). In turn, "[a] challenge to the sufficiency of the § 3553(a) justifications relied on by the district court implicates the substantive reasonableness of the resulting sentence." *Smart*, 518 F.3d at 804.

If the sentence is within the correctly-calculated Guidelines range, we may apply a presumption of reasonableness. *See Kristl*, 437 F.3d at 1054. The defendant or the government may rebut this presumption by demonstrating the sentence is unreasonable when viewed under the § 3553(a) factors. *See id.* at 1054-55. The § 3553(a) factors include not only "the nature of the offense" but the history and "characteristics of the defendant, as well as the need for the

sentence to reflect the seriousness of the crime, to provide adequate deterrence, to protect the public, and to provide the defendant with needed training or treatment ....” *Id.* at 1053; *see also* 18 U.S.C. § 3553(a). We give due deference to the district court’s decision whether the § 3553(a) factors, as a whole, justify a variance. *See Smart,* 518 F.3d at 808.

### a. Procedural Reasonableness

With these principles in mind, we turn to the procedural reasonableness of Mr. Sanchez’s sentence, rejecting his argument the district court erred in calculating the quantity of methamphetamine used to increase his offense level under U.S.S.G. § 2D1.1. “In the aftermath of *Booker*, we have routinely permitted a district court to enhance a defendant’s sentence using uncharged conduct proven to the court by a preponderance of the evidence.” *United States v. Rodriguez-Felix*, 450 F.3d 1117, 1131 (10th Cir. 2006). We have held the drug quantities used by the district court to calculate the applicable Guidelines range are clearly erroneous only when its findings are without factual support in the record or we are left with the definite and firm conviction that a mistake was made. *See United States v. Todd*, 515 F.3d 1128, 1135 (10th Cir. 2008).

Here, the district court’s finding on the quantities of methamphetamine attributable to Mr. Sanchez are supported by Mr. Bollen’s testimony, which it

clearly deemed credible.  Because the quantity of methamphetamine for such relevant conduct has factual support in the record, the district court's approximation on the quantity of methamphetamine used to calculate Mr. Sanchez's sentence was not clearly erroneous; neither are we otherwise left with a definite and firm conviction a mistake was made.

With respect to the two-level increase under U.S.S.G. § 2D1.1(b)(1) for possession of a firearm, we similarly reject Mr. Sanchez's argument physical proximity to the methamphetamine alone is insufficient for a two-level increase in his offense level.  Section 2D1.1(b)(1) provides for a two-level enhancement "[i]f a dangerous weapon (including a firearm) was possessed" during the drug trafficking offense and reflects the "increased danger of violence when drug traffickers possess weapons."  U.S.S.G. § 2D1.1 & cmt. n.3.  Commentary to § 2D1.1(b)(1) also states the enhancement applies "if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense."  U.S.S.G. § 2D1.1, cmt. n.3.  We have held possession under § 2D1.1(b)(1) "may be satisfied by showing mere proximity to the offense."  *United States v. Smith*, 131 F.3d 1392, 1400 (10th Cir. 1997).  We have also said this burden is satisfied when the government demonstrates a "temporal and spatial relation existed between the weapon, the drug trafficking activity, and the defendant."  *United States v. Williams*, 431 F.3d 1234, 1237 (10th Cir. 2005) (quotation marks

omitted).  To meet this burden, the government need only show the weapon was found in the same location where the drugs were stored.  *See id.*  Here, the government presented evidence, including photographs, showing the methamphetamine was only a few feet away from the shotgun.  For these reasons, the district court did not err in attributing the firearm to Mr. Sanchez for the purpose of applying the two-level enhancement for possession of a dangerous weapon.

b.  Substantive Reasonableness

Having determined Mr. Sanchez's sentence is procedurally reasonable, we turn to its substantive reasonableness.  Because his sentence is within the correctly-calculated Guidelines range, we apply a presumption of reasonableness which Mr. Sanchez must rebut by demonstrating his sentence is unreasonable in light of the sentencing factors in § 3553(a).  In imposing a sentence at the low end of the Guidelines range, the district court explicitly stated it considered Mr. Sanchez's objections and arguments, its authority to vary from the advisory Guidelines, and the sentencing factors in 18 U.S.C. § 3553(a).

Because the district court properly considered the § 3553(a) factors in addressing Mr. Sanchez's arguments, we do not discern any form of substantive error.  Moreover, Mr. Sanchez has not demonstrated his family circumstances,

gainful employment; legal immigrant resident status; or lack of prior criminal history, formal education, training, or drug treatment are sufficiently compelling for the purpose of making his 235-month sentence unreasonable. They are but a few of the factors the district court considered when it viewed the § 3553(a) factors as a whole and determined the serious nature of his offense in trafficking an exceedingly large amount of methamphetamine, together with other § 3553(a) sentencing factors, warranted a sentence within the Guidelines range. Under these circumstances, we cannot say Mr. Sanchez sufficiently rebutted the presumption his sentence is substantively reasonable.

## III. Conclusion

For the reasons contained herein, we **AFFIRM** Mr. Sanchez's conviction and sentence.


**Entered by the Court:**

**WADE BRORBY**
United States Circuit Judge