**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

**March 10, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

JORGE PORTILLO-URANGA,

    Defendant - Appellant.

No. 20-3191

_____

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 2:17-CR-20074-JAR-1)**
_____

Jonathan Laurans, Kansas City, Missouri, for Defendant-Appellant.

James A. Brown, Assistant United States Attorney (Duston J. Slinkard, Acting United States Attorney, with him on the brief), Office of the United States Attorney, District of Kansas, Topeka, Kansas, for Plaintiff-Appellee.

_____

Before **TYMKOVICH**, Chief Judge, **SEYMOUR** and **EBEL**, Circuit Judges.

_____

**TYMKOVICH**, Chief Judge.

_____

During a drug trafficking investigation that spanned several years, Drug

Enforcement Administration (DEA) agents utilized judicially authorized wiretaps to

intercept Jorge Portillo-Uranga's communications. After he was arrested and

charged with drug trafficking crimes, Portillo-Uranga moved to suppress all evidence

obtained from the wiretaps. He claimed, among other things, that (1) the government failed to establish its investigative need for the wiretaps, and (2) the interception of his communications occurred outside the authorizing court's territorial jurisdiction. After the district court denied his motion, Portillo-Uranga pleaded guilty but reserved the right to appeal the denial of the suppression motion. At sentencing, the district court applied a two-level sentencing enhancement for firearms possession because DEA agents found firearms and indicia of drug trafficking throughout Portillo-Uranga's ranch when they arrested him.

Portillo-Uranga contends the district court erred by denying his motion to suppress and by applying the sentencing enhancement for firearms possession. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm. The district court did not err in finding the government established a need for the wiretaps, and the interception in Kansas satisfied controlling Tenth Circuit caselaw regarding territorial jurisdiction. The government also established a nexus between the firearms located on Portillo-Uranga's ranch and the drug trafficking charges.

## I.  Background

In 2012, the DEA launched an investigation into a Kansas City-based drug trafficking organization that distributed cocaine and marijuana and had ties to a drug cartel in Guadalajara, Mexico. Through confidential sources, DEA agents determined that an individual nicknamed "Pelon" or "Pelon Portillo" held a leadership role within the Kansas City organization. Pelon is defendant Jorge Portillo-Uranga.

2

The DEA intended to accomplish several objectives through its investigation. The agency aspired to learn the identities of key personnel within the organization as well as its drug suppliers and customers. The DEA also endeavored to locate the stash locations for drugs and discover how drug proceeds were distributed. The ultimate goal of the DEA's investigation was to obtain "admissible evidence that proves beyond a reasonable doubt" targeted individuals committed drug trafficking offenses. App., Vol. 9 at 2449.

The investigation occurred in two phases. The main objective of Phase I was to gather information about the organization's overall structure and identify key members. In pursuit of these goals, DEA agents utilized a variety of investigative techniques, such as confidential sources, controlled purchases, search warrants, pole cameras, and physical surveillance. Although many of these methods proved fruitful for the investigation, agents were unable to gather all the critical information they were seeking, such as the identities of leaders and supply sources. The agency therefore decided to seek judicial authorization for the use of wiretaps to intercept communications of targeted individuals. As part of their wiretap applications, investigating agents submitted affidavits that described their use of other investigative techniques and explained why wiretaps were necessary for the investigation.

A federal court in Kansas authorized the interception of wire and electronic communications of twelve different phones (referred to as Target Telephones #1–12) during Phase I, which lasted from May 2014 to July 2015. Although Portillo-

Uranga's personal phones were not subject to any wiretaps during Phase I, Portillo-Uranga—through his nickname—was listed as a targeted individual in each Phase I wiretap application. Phase I culminated with the arrest and successful prosecution of over a dozen members of the organization. But despite achieving some success in Phase I, the DEA had failed to identify and arrest key leaders, such as Portillo-Uranga. The DEA therefore launched Phase II of the investigation, which focused on identifying and targeting leaders of the organization.

While agents continued using normal investigative techniques in Phase II, they again sought authorization for wiretaps to aid their investigation. In total, the DEA received authorization to intercept communications from nineteen phones (Target Telephones #13–32),[1] most of which were used by Portillo-Uranga or his main distributor, Jesus Arellanes-Portillo.

The Phase II wiretaps were active from December 2016 until around August 2017. During that period, agents intercepted over 400 of Portillo-Uranga's pertinent telephone conversations. The calls revealed that Portillo-Uranga—who at that time had not been identified and was still known to the DEA only by his nicknames—was responsible for facilitating the acquisition and distribution of at least 70 kilograms of cocaine and 450 kilograms of marijuana.

---

[1] The target subjects had "a history of utilizing pre-paid disposable cellular telephones" that were regularly disconnected or discarded, which is part of the reason why agents had to constantly apply for wiretap authorizations of new phone numbers. *See* App., Vol. 5 at 1239–40.

In December 2017, DEA agents executed a search warrant at Portillo-Uranga's ranch in Teague, Texas. When agents arrived at the property, Portillo-Uranga fled and hid under a porch. Agents quickly arrested him and identified him for the first time. During a subsequent search of the property, agents found handguns, assault rifles, fraudulent identification documents, numerous cell phones, cash, a ledger that was possibly used to track drug transactions, and a fuel tank that may have been used to transport drugs.

Portillo-Uranga was charged with eight counts related to his drug trafficking activities. He moved to suppress evidence obtained from the wiretaps on multiple grounds. After a hearing, the district court denied the motion.

Portillo-Uranga pleaded guilty—without a plea agreement—to the following counts: one count of conspiracy to distribute and possess with intent to distribute cocaine and marijuana; two counts of use of a communication facility to facilitate a drug trafficking offense; two counts of money laundering; and three counts of possession with intent to distribute more than 500 grams of cocaine.[2]

## II. Analysis

Portillo-Uranga contends the district court erred by denying his motion to suppress and applying the two-level sentencing enhancement for firearms possession. He claims the district court should have suppressed the wiretap

---

[2] Portillo-Uranga's guilty plea was later changed to a conditional plea under Fed. R. Crim. Pro. 11(a)(2) so that he could appeal the court's denial of his motion to suppress.

evidence because (1) the government failed to establish its need for the wiretaps, and (2) the interception of the calls did not take place within the territorial jurisdiction of Kansas as required by Title III and the wiretap authorizations. Portillo-Uranga also contests the district court's application of the sentencing enhancement for possession of firearms.

We conclude the government established necessity for the wiretaps, Portillo-Uranga waived his territorial jurisdiction argument, and the district court correctly applied the sentencing enhancement.

### A. Motion to Suppress

At the district court, Portillo-Uranga argued that the wiretap evidence should be suppressed on the following grounds: (1) the wiretap tapes were not timely sealed; (2) the government did not follow proper minimization procedures; (3) the government did not provide records showing that interception occurred within Kansas; (4) the government failed to show necessity for the wiretaps; and (5) proper notice of the intercepted communications was not given to Portillo-Uranga. The district court rejected each ground and denied the motion to suppress.

On appeal, Portillo-Uranga raises only the necessity and territorial jurisdiction arguments as grounds for suppression. We find no error in the district court's denial of Portillo-Uranga's motion.

6

*1. Necessity*

Under Title III of the Omnibus Crime Control and Safe Streets Act of 1968, wiretap applications are subject to a necessity requirement that is "designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Foy*, 641 F.3d 455, 464 (10th Cir. 2011) (quoting *United States v. Kahn*, 415 U.S. 143, 153 n.12 (1974)). To obtain judicial authorization for a wiretap, the government must include in each application "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. §§ 2518(1)(c), 2518(3)(c). Normal investigative procedures include: (1) standard physical surveillance; (2) questioning witnesses or suspects, including through grand jury proceedings; (3) search warrants; (4) deploying confidential informants and undercover agents; (5) pen registers; and (6) trap and trace devices. *Foy*, 641 F.3d at 464 (citing *United States v. Cline*, 349 F.3d 1276, 1280 (10th Cir. 2003)).

"Although the necessity requirement is intended to ensure that wiretaps are not used in situations where traditional investigative techniques may achieve law enforcement purposes, we do not require investigating officers to 'exhaust all other conceivable investigative procedures before resorting to wiretapping.'" *Id.* (quoting *United States v. Zapata*, 546 F.3d 1179, 1185–86 (10th Cir. 2008)). But officers need to explain the need for wiretaps with "some degree of specificity"

7

and provide facts related to the specific individuals targeted by the wiretap.  *Id.* (citing *Cline*, 349 F.3d at 1280–81).

Once a wiretap has been authorized, it is presumed proper and the defendant bears the burden of proving that a wiretap is invalid.  *United States v. Ramirez–Encarnacion*, 291 F.3d 1219, 1222 (10th Cir. 2002).  If the defendant successfully challenges the necessity of a wiretap, any evidence seized pursuant to the wiretap must be suppressed.  *Id.*  We review de novo whether 18 U.S.C. § 2518(1)(c)'s requirements were satisfied, but we review the conclusion that a wiretap was necessary for an abuse of discretion.  *Id.* at 1222 & n.1.

Portillo-Uranga claims the government failed to demonstrate necessity in its affidavits supporting the wiretap applications and the district court erred in concluding that the wiretaps were necessary.  Specifically, Portillo-Uranga contends that wiretaps were unnecessary because (1) the government's objectives had already been achieved when agents applied for the wiretaps; (2) traditional and less intrusive investigative techniques had been successful; and (3) the continued use of normal investigative techniques would not have been too dangerous.

After a careful review of the record, we conclude that the government provided a full and complete statement in each affidavit explaining why normal investigative techniques were insufficient to achieve the goals of the investigation and that the government adequately justified the need for each wiretap.

As an initial matter, it is evident from the record that the government's goals had yet to be achieved when the wiretap applications were submitted. The government's investigative goals included the following: (1) discovering the full scope and identification of key personnel involved in the organization; (2) learning the identities of illegal drug suppliers; (3) uncovering the identity of the main drug customers; (4) locating the organization's drug-stash sites; (5) discovering the management and disposition of proceeds generated by drug trafficking; and (6) obtaining admissible evidence that proves beyond a reasonable doubt that the target subjects committed the alleged violations of law set forth in the affidavits.[3] Although Portillo-Uranga argues the government's goals "had already been achieved" when it applied for wiretap authorizations, he nonetheless concedes that several of the government's objectives had not been achieved, such as locating drug-stash sites and determining the disposition of drug proceeds. *See* Aplt. Br. at 25–28.

We disagree with Portillo-Uranga that the government's goals had already been achieved when agents applied for each wiretap authorization. Although agents were able to gather some intelligence about the organization and

---

[3] Portillo-Uranga argues that the government's investigation objectives were "boilerplated generalizations germane to every drug trafficking investigation." Aplt. Br. at 25. We agree with the district court that the government's objectives were "legitimate" and "neither overly broad nor illusory." App., Vol. 16 at 4631; *see also Foy*, 641 F.3d at 464–65 ("[W]e have held on numerous occasions that the law enforcement goal of uncovering the size and scope of the conspiracy may justify the authorization of wiretaps.").

individuals through normal investigative techniques, the agents were unsuccessful in learning key details, such as the identities of targeted personnel and suppliers. In fact, the DEA did not learn Portillo-Uranga's true identity until he was arrested in December 2017—over three years after the first wiretap in the case was authorized. Though the DEA had learned some information about Portillo-Uranga's identity, investigating agents did not know his first name, last name, or date of birth. The government's inability to gather such information despite years of using traditional investigative techniques and wiretaps highlights why agents thought the initial and continued use of wiretaps was necessary to achieve their goals.

In addition to describing why their goals had yet to be achieved, the government agents explained with specificity why normal investigative techniques were inadequate to accomplish their investigative goals. Each affidavit includes a list of the investigative techniques that had been used or considered up to that point in the investigation. For instance, in the affidavit supporting the DEA's first application for a wiretap in May 2014, the affiant explained how the investigating agents had (1) employed four confidential sources to infiltrate the drug organization; (2) conducted three controlled drug purchases; (3) used physical surveillance to observe suspects; (4) installed a pole camera near a potential drug trafficking location; (5) tracked suspects through GPS location data; (6) executed search warrants to obtain cell-site location information for target subjects; (7) spoken directly with a suspect in an attempt to

10

gain his cooperation; (8) used trap and trace devices, pen registers, and toll record analysis to generate a list of phone numbers contacted by target subjects; and (9) initiated a financial investigation to examine tax, banking, and real estate records of target subjects.

In the same affidavit, the affiant meticulously described the ways in which each technique had been successful as well as the disadvantages of each technique compared to a wiretap. The affiant also explained why the use of other techniques, such as undercover agents, grand juries, interviews, trash searches, and mail covers, were unlikely to be successful if used. In one section, the affiant describes why a wiretap was needed to intercept the communications of Edwin Pacheco, a drug distributor. The affiant explains how a confidential source had been unable to meet or negotiate with Pacheco directly despite being trusted by Pacheco's underling. As a result, the confidential source could not gather information about Pacheco's drug supply sources. Based on this experience and the fact that the organization was "extremely tight-knit and cohesive," App., Vol. 5 at 1228, the affiant concludes that the use of confidential sources or undercover agents would be unlikely to achieve the government's goal of identifying leaders, the location of drug-stash sites, and sources of supply.

All the affidavits also describe why certain investigative techniques, such as interviews of key personnel, would be futile or too dangerous to employ. Before the government applied for any wiretap authorizations, a DEA agent arrested a low-level drug supplier named Jairo Escobar, who worked for Oscar

Aguilera, a key supplier in the target network. Escobar agreed to cooperate with the agent and called Aguilera while under DEA observation to order more drugs. When it became clear during the phone call that Aguilera believed Escobar had been arrested, the agent picked up the phone and attempted to convince Aguilera to cooperate. Aguilera said that he was willing to cooperate, but this turned out to be a lie. Several days later, Escobar reported that Aguilera's associates had driven by Escobar's house and made threats against Escobar for cooperating with the agents. This incident and other similar facts included in the affidavits underscore why normal investigative techniques such as interviews would be unlikely to achieve the government's investigative goals or too risky to employ.

The DEA continued using many of the same traditional investigation techniques after it received authorization to use wiretaps. Each subsequent affidavit filed in support of an additional wiretap or an extension of an existing wiretap included a similar list of traditional investigative techniques as the affidavit supporting the first wiretap. When agents used additional confidential sources or executed a search warrant, they added that information in their wiretap affidavits to show that they continued to utilize traditional investigative techniques but that a wiretap was still necessary to achieve the investigation goals. *See, e.g.*, App., Vol. 9 at 2601–03 (affidavit in support of wiretap application for Target Telephones #14–16 describing additional surveillance that had been conducted since the authorization of Target Telephone #13 wiretap).

Based on our review of the wiretap applications, we conclude the government provided in each affidavit "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c).  Although normal investigative techniques had achieved limited success during the investigation, the DEA agents adequately explained in each affidavit why wiretaps were necessary.  The district court thus did not abuse its discretion in concluding that the government established necessity for the wiretaps.

### 2. Territorial Jurisdiction

Portillo-Uranga next claims the wiretap evidence should be suppressed because interception occurred outside the territorial jurisdiction of Kansas. Under Title III, a judge may only authorize the interception of communications "within the territorial jurisdiction of the court in which the judge is sitting." *Id.* § 2518(3).[4]  Although Title III does not specify where interception takes place, we have held that "interception occurs both where the tapped telephone is located and where the intercepted communications are first heard by law enforcement officials." *United States v. Dahda*, 853 F.3d 1101, 1112 (10th Cir. 2017), *aff'd*, 138 S. Ct. 1491 (2018).  Portillo-Uranga argues that the interception of his

---

[4]  There is a statutory exception to this rule—a court may authorize the interception of communications "outside [its] jurisdiction but within the United States in the case of a mobile interception device authorized by a Federal court within such jurisdiction."  18 U.S.C. § 2518(3).

communications exceeded the territorial jurisdiction of the authorizing court because the tapped phones were located outside of Kansas and the calls were routed to the DEA's office in Kansas through its division office in Missouri.

Having reviewed the district court proceedings, we conclude that Portillo-Uranga waived this argument because he never presented it to the district court and failed to raise it in his opening brief.[5]

In his motion to suppress, Portillo-Uranga presented a territorial jurisdiction argument, but he did not present the specific argument he raises on appeal. This constitutes waiver. *See United States v. Dewitt*, 946 F.2d 1497, 1502 (10th Cir. 1991) ("[W]aiver . . . applies not only to the failure to make a pretrial motion, but also to the failure to include a particular argument in the motion."). In his motion, Portillo-Uranga argued only that the government failed to provide records to show that interception occurred within the territorial jurisdiction of the court and thus "Defendant is unable to assess whether the Government has abided by its promise to only intercept telephone calls in Kansas." App., Vol. 1 at 65–66. Portillo-Uranga did not contend that interception occurred outside Kansas—he merely argued that he needed more information to determine where the calls were intercepted.

---

[5] Because we deem this argument waived, we need not consider the government's surreply brief responding to the plain-error argument made by Portillo-Uranga in his reply brief. We therefore deny the government's motion for leave to file its surreply brief.

At the suppression hearing, a DEA agent testified that during the investigation, the DEA's listening post was always located in Kansas. The agent also explained that calls were routed through the DEA's division office in Missouri to the Kansas office where agents would listen to the live conversations. On appeal, Portillo-Uranga argues this relay process means that the calls were intercepted in Missouri, not Kansas. But Portillo-Uranga never made this argument before the district court, even though he had an opportunity to do so at the suppression hearing. Before ending the hearing, the district court explained that further argument was not necessary "unless there's something that's developed during today's hearing that you want me to focus on." App., Vol. 21 at 5552. Portillo-Uranga's counsel declined to present any additional arguments, telling the court that he would "submit it on the briefs." *Id.*

We may consider an argument not raised below under the plain-error standard. Fed. R. Crim. P. 52(b); *United States v. Denogean*, 79 F.3d 1010, 1012 (10th Cir. 1996). But we typically only consider the argument if the appellant argues for plain-error review in his opening brief. *United States v. Leffler*, 942 F.3d 1192, 1197 (10th Cir. 2019) ("[W]e generally do not consider arguments made for the first time on appeal in an appellant's reply brief and deem those arguments waived."). Although we have discretion to "consider a plain-error argument raised for the first time in a reply brief, we are not required to do so." *Id.* at 1200.

15

Portillo-Uranga failed to preserve his territorial jurisdiction argument despite having multiple opportunities to raise it before the district court. He also did not argue for plain-error review on appeal until after the government asserted waiver in its response brief. At both the trial court and on appeal, Portillo-Uranga was represented by counsel, which weighs in favor of finding waiver. *See id.* at 1199 ("We also *might* be willing to overlook Defendant's failure to argue for plain error in his opening brief if Defendant was proceeding pro se on appeal. . . . But in this case Defendant was represented by counsel at trial and is represented by counsel on appeal."). We thus deem the argument waived.[6]

\* \* \*

For these reasons, we affirm the denial of Portillo-Uranga's motion to suppress.

---

[6] Even if the argument was forfeited and not waived, Portillo-Uranga would still not prevail because he has not shown that the district court's decision was plainly erroneous. The district court concluded that all interceptions took place within the court's territorial jurisdiction because the intercepted communications were first heard by agents at their listening post in Kansas. That conclusion is consistent with our precedent and thus does not constitute plain error. We have held that a communication is intercepted for purposes of § 2518(3) either "where the tapped telephone is located" or "where the contents of the redirected communication are to first be heard." *United States v. Tavarez*, 40 F.3d 1136, 1138 (10th Cir. 1994) (quoting *United States v. Rodriguez*, 968 F.2d 130, 136 (2d Cir. 1992)). Because the DEA agents first heard the intercepted communications at their listening post in Kansas, the district court did not err—let alone plainly err—by concluding that all communications were intercepted within its territorial jurisdiction.

### B. *Sentencing Enhancement*

Portillo-Uranga also challenges the district court's imposition of a two-level sentencing enhancement under U.S.S.G. § 2D1.1(b)(1) for possession of a firearm. He argues the government failed to meet its burden to show that the firearms discovered at his property were temporally and spatially connected to his drug-trafficking activity. We agree with the district court that the two-level enhancement for firearms possession was appropriate.

"When evaluating the district court's interpretation and application of the Sentencing Guidelines, we review legal questions de novo and factual findings for clear error, giving due deference to the district court's application of the guidelines to the facts." *United States v. Mollner*, 643 F.3d 713, 714 (10th Cir. 2011) (quoting *United States v. Munoz-Tello*, 531 F.3d 1174, 1181 (10th Cir. 2008)). A two-level sentencing enhancement "should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." U.S.S.G. § 2D1.1 app. cmt. n.11(A). The government bears the initial burden of proving by a preponderance of the evidence that the defendant possessed a firearm, which may be satisfied by showing "that a temporal and spatial relation existed between the weapon, the drug trafficking activity, and the defendant." *United States v. Pompey*, 264 F.3d 1176, 1180–81 (10th Cir. 2001) (quoting *United States v. Roederer*, 11 F.3d 973, 982 (10th Cir. 1993)). Once the government establishes a nexus, the burden shifts to the defendant to show "that

17

it is clearly improbable the weapon was connected with the offense." *Id.* (quoting *United States v. Vaziri*, 164 F.3d 556, 568 (10th Cir. 1999)).

When DEA agents executed a search warrant at Portillo-Uranga's ranch in December 2017, they found eight rifles and nine handguns on the property. In the master bedroom, agents found a gold M1911 pistol with the initials "J.P." engraved on the grip—which the district court presumed stood for Jorge Portillo-Uranga because it was his bedroom. App., Vol. 17 at 4969. Agents also found an AR-15 rifle with a scope and 30-round magazine next to a dresser and a container with cash in the same room. In the master bedroom closet, agents discovered a safe containing three M1911 pistols, an expense ledger, and seven cell phones.

Agents found more firearms and indicia of drug trafficking in Portillo-Uranga's horse barn. A search of the small office inside the barn uncovered two AK-47 rifles with a 30-round magazine and a drum magazine, as well as another expense ledger. Agents also discovered a bucket underneath the floor of the barn that contained fraudulent identification documents and thousands of dollars in cash. Near the bucket was a large fuel tank with similar features to a fuel tank described by a witness at the suppression hearing that had been used to smuggle drugs.

In its presentencing investigation report, the probation office did not apply a sentencing enhancement for firearms possession because it concluded there was insufficient information "to establish that the firearms recovered at the defendant's property were possessed at the time of and in connection with any

18

drug trafficking or money laundering activities." App., Vol. 20 at 5419. The government objected to the exclusion of a firearms enhancement, arguing there was ample evidence to show that Portillo-Uranga's possession of the firearms "occurred in close proximity to drug trafficking activity and had the potential to facilitate drug trafficking activity at the ranch." *Id.* at 5431.

At the sentencing hearing, the district court agreed with the government and applied the enhancement. The district court found that because the firearms were near Portillo-Uranga's cash, cell phones, and fictitious identification documents, as well as a possible drug ledger and fuel tank used for drug trafficking, there was sufficient evidence that the firearms were possessed in connection with drug trafficking.

The district court did not clearly err by concluding a temporal and spatial relation existed between the firearms, drug trafficking activity, and Portillo-Uranga. Beginning with the spatial relationship, the district court reasonably concluded that Portillo-Uranga possessed firearms in close physical proximity to indicia of drug trafficking. Although no drugs were found at Portillo-Uranga's property, proximity to actual drugs is not required for a § 2D1.1(b)(1) enhancement. *See United States v. Alexander*, 292 F.3d 1226, 1231 (10th Cir. 2002) (proximity to "drug paraphernalia" is sufficient to establish a nexus between a firearm and a drug offense).

Nearly all the firearms possessed by Portillo-Uranga were discovered in the vicinity of items likely used to facilitate drug trafficking. For instance, the

fictitious passports found on the ranch had previously been used by Portillo-Uranga in furtherance of the drug conspiracy. Similarly, the district court concluded that the gas tank found in Portillo-Uranga's horse barn had likely been used to "secrete money or drugs" because one of Portillo-Uranga's drivers had previously been caught by law enforcement using a similar gas tank for such purposes. App., Vol. 17 at 4970. It was therefore reasonable for the district court to apply the sentencing enhancement based on the close proximity between firearms and items used to facilitate drug trafficking.

We also find that a temporal nexus existed because Portillo-Uranga possessed the firearms near indicia of drug trafficking while actively participating in a drug trafficking conspiracy.[7] *See United States v. Humphrey*, 208 F.3d 1190, 1210 (10th Cir. 2000) ("[I]n a drug conspiracy conviction the [firearm possession] adjustment should be applied unless it is clearly improbable that the weapon was connected with the conspiracy offense."), *abrogated on other grounds by Arizona v. Gant*, 556 U.S. 332 (2009).

---

[7] The district court found a temporal nexus based on an April 2017 event where a drug runner brought drugs to the ranch for Portillo-Uranga's inspection prior to distribution. But the government did not provide any evidence to show that weapons were present at the ranch in April 2017. The drug inspection therefore does not establish a temporal and spatial relation between Portillo-Uranga, his drug trafficking activity, and the firearms. But we may affirm on any ground so long as it is supported by the record. *Elkins v. Comfort*, 392 F.3d 1159, 1162 (10th Cir. 2004). Here, the evidence shows that the drug-trafficking conspiracy led by Portillo-Uranga was ongoing when the DEA agents executed the search warrant and discovered the firearms and drug trafficking items.

Portillo-Uranga may overcome this evidence if he can show "it is clearly improbable that the weapon was connected with the offense." U.S.S.G. § 2D1.1 app. cmt. n.11(A). But he has failed to do so here. On appeal, he challenges only the district court's conclusion that the government satisfied its burden. He does not point to any evidence suggesting that the caches of firearms found during the raid of his property were unconnected to his drug trafficking offenses.

Because Portillo-Uranga possessed a firearm in the vicinity of drug trafficking activity, the district court appropriately applied a two-level enhancement under § 2D1.1(b)(1).

## III. Conclusion

For these reasons, we AFFIRM the district court's denial of Portillo-Uranga's motion to suppress and AFFIRM the court's application of a two-level sentencing enhancement for possession of firearms.