**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 11, 2026**

**Christopher M. Wolpert**
**Clerk of Court**

## UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

LEONARDO MEDINA,

    Plaintiff - Appellant.

No. 25-1296
(D.C. No. 1:23-CR-00049-PAB-3)
(D. Colo.)

_____

### ORDER AND JUDGMENT[*]

_____

Before **HOLMES**, Chief Judge, **MATHESON**, and **FEDERICO**, Circuit Judges.

_____

During a federal drug-trafficking investigation, agents obtained a warrant to wiretap various "Target Telephones" ("TT"). Intercepted communications implicated Leonardo Medina and led to a six-count indictment for drug-related offenses. The district court denied Mr. Medina's motion to suppress the evidence obtained from the wiretaps. A jury convicted him on all six counts.

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Mr. Medina appeals the district court's suppression ruling.  Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I.  BACKGROUND

### A.  *Factual History*

In January 2021, Department of Homeland Security ("DHS") agents began investigating a drug trafficking organization ("DTO") in Denver, Colorado.  DHS agents spoke to confidential informants, sent undercover officers to participate in controlled purchases, conducted surveillance, and analyzed public records and information obtained from pen registers and trap and trace devices.  They identified several suspected DTO members, including leader Martin Piedra-Gutierrez and distributors Juan Rojo-Salas and Mr. Medina.  But the investigation had not revealed the DTO's "full scope" and structure; its main customers, suppliers, and stash house locations; or how the DTO managed its illicit proceeds.  ROA, Vol. 1 at 359-60.

In March 2022, the Government requested a wiretap order to intercept communications from Mr. Piedra-Gutierrez's cell phone ("TT1").  Attached to the TT1 wiretap application was DHS Agent Joshua Lievers's affidavit.  The affidavit outlined the investigation's goals, the investigative techniques already employed and their limitations, the techniques not employed, and Agent Lievers's basis for believing that the wiretap was necessary to further the investigation.  A federal district court judge issued an order authorizing the TT1 wiretap.

A month of monitoring the TT1 cell phone revealed that Mr. Rojo-Salas supplied narcotics to Mr. Piedra-Gutierrez.  Investigators sought and obtained

judicial authorization to continue monitoring TT1 and to begin monitoring Mr. Rojo-Salas's phone ("TT2").

Interceptions from TT1 and traditional investigative techniques revealed that Mr. Medina also supplied narcotics to Mr. Piedra-Gutierrez. Investigators sought and obtained a wiretap order to intercept communications from Mr. Medina's phone ("TT3"), but shortly after monitoring began, they learned the phone was no longer in service. Using a combination of CCTV footage, phone toll analysis, court-authorized cell-cite simulators and GPS trackers, and physical surveillance, investigators identified two additional phones belonging to Mr. Medina. The Government sought judicial authorization to wiretap Mr. Medina's second ("TT4") and third phones ("TT5").

Attached to the TT4/TT5 wiretap application was another affidavit from Agent Lievers. It set out the investigation's goals and Agent Lievers's basis for believing that the wiretap was necessary. The affidavit also incorporated his affidavits in support of TT1, TT2, and TT3. The district court authorized the TT4 and TT5 wiretaps.

The TT1 and TT5 wiretaps revealed incriminating information about Mr. Medina's involvement in the DTO. He challenges both of them here.

### B. Procedural History

The investigation resulted in a 33-count indictment against 13 individuals. It charged Mr. Medina with six counts.[1] He moved to suppress the wiretap evidence, arguing the Government failed to establish that the wiretaps were necessary. The district court denied the motion, concluding that Agent Lievers's affidavits detailed the traditional investigative techniques investigators employed and sufficiently demonstrated necessity.

At trial, the Government presented extensive evidence obtained from the TT1 and TT5 wiretaps. A jury convicted Mr. Medina on all charges, and the district court sentenced him to 360 months in prison. He timely appealed.

### II. DISCUSSION

### A. Standard of Review

We review a district court's determination that a wiretap was necessary for an abuse of discretion. *United States v. Ramirez-Encarnacion*, 291 F.3d 1219, 1222 (10th Cir. 2002). "Once a wiretap has been authorized, it is presumed proper and the

---

[1] The indictment charged Mr. Medina with conspiracy to possess with intent to distribute methamphetamine, fentanyl, and cocaine in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii), (b)(1)(B)(vi), (b)(1)(B)(viii), (b)(1)(C), and 846 (Count 1); possession with intent to distribute 50 grams or more of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii), and 18 U.S.C. § 2 (Counts 22 and 33); possession with intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii), and 18 U.S.C. § 2 (Counts 30 and 31); and possession with intent to distribute a mixture and substance containing a detectable amount of fentanyl in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) and 18 U.S.C. § 2 (Count 32).

defendant bears the burden of proving that a wiretap is invalid." *United States v. Portillo-Uranga*, 28 F.4th 168, 174 (10th Cir. 2022).

### B.  *Legal Background*

Title III of the Omnibus Crime Control and Safe Streets Act of 1968 prohibits the intentional interception of wire communications absent judicial authorization. *See* 18 U.S.C. § 2510 et seq.; *United States v. Castillo-Garcia*, 117 F.3d 1179, 1184-85 (10th Cir. 1997) (quotations omitted), *overruled on other grounds by Ramirez-Encarnacion*, 291 F.3d 1219.  The Act establishes a three-step procedure to obtain a wiretap order:  (1) "a duly-authorized law enforcement officer must obtain approval from the Attorney General of the United States or a specially designated assistant attorney general in order to apply to a federal judge for a wiretap"; (2) "once such approval is obtained, the officer must present a written application for a wiretap to the judge"; and (3) "the judge must make certain enumerated findings and issue an *ex parte* order containing specified elements." *Castillo-Garcia*, 117 F.3d at 1184-85 (quotations omitted); *see also United States v. Iiland*, 254 F.3d 1264, 1267 (10th Cir. 2001).

The application "must show, among other things, that a wiretap is necessary." *United States v. Barajas*, 710 F.3d 1102, 1107 (10th Cir. 2013).  To make this showing, the Government must submit "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." *United States v. Foy*, 641 F.3d 455, 464 (10th Cir. 2011) (quoting 18 U.S.C. § 2518(1)(c));

*see also* 18 U.S.C. § 2518(3)(c). Traditional investigative methods include "(1) standard surveillance; (2) questioning and interrogating witnesses or suspects, including through the use of grand jury proceedings; (3) search warrants; (4) infiltration of criminal groups by confidential informants and undercover agents; (5) pen registers; and (6) trap and trace devices." *Foy*, 641 F.3d at 464. If the Government has not employed these traditional techniques, it must explain why "with particularity." *United States v. Cline*, 349 F.3d 1276, 1280 (10th Cir. 2003). Generalities and conclusory statements that traditional methods would be unsuccessful are insufficient. *Id.* at 1280-81; *Castillo-Garcia*, 117 F.3d at 1188.

"Although the necessity requirement is intended to ensure that wiretaps are not used in situations where traditional investigative techniques may achieve law enforcement purposes, we do not require investigating officers to 'exhaust all other conceivable investigative procedures before resorting to wiretapping.'" *Portillo-Uranga*, 28 F.4th at 174 (quoting *Foy*, 641 F.3d at 464); *see also United States v. Zapata*, 546 F.3d 1179, 1185-86 (10th Cir. 2008)). "Rather, we review the government's actions in a common-sense fashion, and consider all the facts and circumstances in order to determine whether the government's showing of necessity is sufficient to justify a wiretap." *Barajas*, 710 F.3d at 1107 (quotations omitted).

"If an application was granted without meeting the necessity requirement, the wiretap evidence must be suppressed." *Iiland*, 254 F.3d at 1267 (quoting *United States v. Green*, 175 F.3d 822, 828 (10th Cir. 1999)).

6

### C.  Analysis

Mr. Medina argues the district court abused its discretion when it denied his motion to suppress because the Government failed to show necessity.  He limits his challenge on appeal to the TT1 (Mr. Piedra-Gutierrez's phone) and TT5 (Mr. Medina's third phone) wiretap applications.[2]  He contends the Government failed to demonstrate that the traditional techniques it employed were ineffective and that it gave conclusory, boilerplate justifications for failing to employ other traditional techniques.  Aplt. Br. at 23-35.  We disagree.

**1.  Traditional Investigative Techniques Used**

Mr. Medina argues that the Government's traditional investigation methods were effective, undermining the need for a wiretap.  Aplt. Br. at 24.  But the affidavits showed otherwise.  They demonstrated that the traditional methods were insufficient to meet the investigation's goals of uncovering details about the DTO's members, customers, and suppliers, and its scope and operational structure.  *See, e.g.*, *Portillo-Uranga*, 28 F.4th at 175 ("Although agents were able to gather some intelligence about the organization and individuals through normal investigative techniques, the agents were unsuccessful in learning key details . . . .")

Agent Lievers's TT1 affidavit described the investigation's goals as follows: (1) "discovering the full scope and identification of key personnel involved in illegal

---

[2] At oral argument, Mr. Medina conceded that if the TT1 affidavit satisfied the necessity requirement, then the TT5 affidavit, which incorporates the TT1 affidavit and contains additional detail, was also likely sufficient.  *See* Oral. Arg. at 2:06-5:55.

drug trafficking on behalf of [Mr. Piedra-Gutierrez] and the DTO;" (2) "discovering the identities and roles of all suppliers of methamphetamine, fentanyl, and/or other drugs or controlled substances to the identified conspirators;" (3) "discovering the identity of the main customers and suppliers of [Mr. Piedra-Gutierrez] and others yet unknown;" (4) "discovering the stash locations where methamphetamine, fentanyl, and/or other drugs are stored prior to distribution;" (5) "discovering the management and disposition of proceeds generated by the organization's narcotics trafficking;" and (6) "obtaining admissible evidence that demonstrates beyond a reasonable doubt that [the named interceptees] committed the alleged violations of law set forth herein." ROA, Vol. 1 at 359-60. The TT5 affidavit identified similar objectives. *See id.* at 715.

Each affidavit described the traditional investigative techniques used during the investigation. The TT1 affidavit discussed information obtained through confidential informants, controlled purchases by undercover officers, physical surveillance, trash searches, public records searches, telephone toll records, pen registers, trap and trace devices, pole cameras, GPS devices, and financial records. The TT5 affidavit reiterated and expanded on these techniques, detailing new information investigators obtained from previous wiretaps and ongoing surveillance efforts.

The affidavits explained the value and limitations of each method in detail. For instance, investigators used confidential informants to facilitate controlled buys and provide information about the location of narcotics. But, as Agent Lievers

8

explained in the TT1 affidavit, confidential informants had limited access to the investigation's targets and were unable to record conversations with them. ROA, Vol. 1 at 360-62; *see Cline*, 349 F.3d at 1282 (the use of confidential informants was not an effective means to achieve the investigation's goals due to the conspiracy's compartmentalized nature); *see also Portillo-Uranga*, 28 F.4th at 175-76 (confidential informants' limited access to conspirators meant they could not gather information necessary to the investigation). The TT5 affidavit noted that the three informants lacked information about Mr. Medina. ROA, Vol. 1 at 721-22, 724; *see Castillo-Garcia*, 117 F.3d at 1189 (where confidential informants had participated in multiple controlled buys but had never been introduced to suppliers, the Government "reasonably concluded that the attempted use of a confidential informant to discover . . . suppliers had failed").

Controlled purchases had similar utility and limits. Although officers obtained a host of physical evidence through this technique, including over 12,000 fentanyl pills and six pounds of methamphetamine, the controlled purchases provided "limited information on the overall operations and structure of the DTO," its "coconspirators," "the locations of narcotics being stored or transported for the DTO," and how the DTO was "launder[ing] their illicit proceeds." ROA, Vol. 1 at 362-63. Agent Lievers explained in the TT1 affidavit that additional controlled purchases were unlikely to further the investigation because "DTO's [sic] do not share operational knowledge with narcotics purchasers about their trafficking operations, thus compartmentalizing their business and profits." *Id.* at 368. In the TT5 affidavit,

9

he elaborated that controlled purchases did little to illuminate the role of the DTO's leaders and distributors, like Mr. Medina. *Id.* at 728-29.

The affidavits also detailed investigators' extensive physical surveillance efforts and the low likelihood of obtaining valuable information from further surveillance. Investigators surveilled Mr. Piedra-Gutierrez's, Mr. Rojo-Salas's, and Mr. Medina's residences, installed pole cameras, and attempted to use GPS monitoring to track DTO members' vehicles. On one occasion, the TT1 wiretap intercepted Mr. Medina telling Mr. Piedra-Gutierrez that "the 'burros' arrive on Friday." *Id.* at 693. Investigators understood this to concern a shipment of methamphetamine, so they "set up surveillance on Piedra-Gutierrez's known residence" and observed Mr. Medina arrive at the house, enter the residence for about 15 minutes, and then leave. *Id.* at 693-94. The affidavits detailed other similar incidents.

As the TT1 affidavit stated, although "continued surveillance may reveal additional meetings and possible meeting sites and may potentially lead to the identification of some other individuals, it will not fully identify the roles of the [named interceptees] . . . or otherwise provide admissible evidence about this investigation." *Id.* at 366-67. The TT5 affidavit similarly represented that physical surveillance could be used to "confirm meetings and other suspected criminal activity between alleged participants," but it was often insufficient "to prove the purpose of the meetings and other activity." *Id.* at 724.

10

Finally, both affidavits recounted information gleaned from pen register records and trap and trace devices. An analysis of this information showed the number of phone calls and text messages and the phone numbers contacted by a particular phone. But, as Agent Lievers explained in the TT1 affidavit, this technique did not "establish the identities of all the persons called or the content of the conversations." *Id.* at 373; *see Castillo-Garcia*, 117 F.3d at 1189 (pen register and trap and trace devices "did not enable the government to identify the individuals placing the calls to [the wiretap target], nor did they reveal the nature or purpose of the communications"). The TT5 affidavit, expanding on this point, noted that "it is unknown whether those conversations involve additional deals and/or customers who remain unidentified." ROA, Vol. 1 at 719; *see Cline*, 349 F.3d at 1282 (pen registers "did not reveal the identities of the parties to the conversation nor the nature or substance of the conversation, nor differentiate between legitimate calls and those for criminal purposes").

As the foregoing discussion demonstrates, both the TT1 and TT5 affidavit (which built upon the TT1 affidavit) provided "a full and complete statement . . . explaining why normal investigative techniques were insufficient to achieve the goals of the investigation." *Portillo-Uranga*, 28 F.4th at 174; 18 U.S.C. § 2518(1)(c).

## 2. Traditional Techniques not Used

Mr. Medina also argues that the Government "wholly failed" to employ other methods of investigation that would have rendered wiretapping unnecessary and failed to offer any non-conclusory justification for failing to employ these methods.

Aplt. Br. at 24.  He primarily focuses on the Government's surveillance.  He acknowledges that officers engaged in some forms of physical surveillance, but he argues that officers failed to conduct (a) additional physical surveillance, and (b) mobile surveillance.  *Id.* at 24-28, 32-34.[3]

### a. Physical surveillance

Mr. Medina argues that investigators should have conducted additional physical surveillance, including surveilling the controlled buys and further analyzing the data from the GPS tracker attached to Mr. Medina's car.  *Id.* at 25, 32-33.  But "we do not require investigating officers to exhaust all other conceivable investigative procedures before resorting to wiretapping." *Portillo-Uranga*, 28 F.4th at 174 (quotations omitted).  The extensive physical surveillance recounted above was sufficient to show the Government "tried" to use the technique before seeking a wiretap order.  *Foy*, 641 F.3d at 464 (quoting 18 U.S.C. § 2518(1)(c)).  And, as recounted above, Agent Lievers's affidavits adequately explained the limitations of additional surveillance.  *See* ROA, Vol. 1 at 366-67, 724; *see also United States v. Verdin-Garcia*, 516 F.3d 884, 890 (10th Cir. 2008) (accepting the Government's

---

[3] The Government asserts that Mr. Medina waived his arguments about the adequacy of investigators' surveillance by failing to raise them below.  Aplee. Br. at 12.  Maybe so, but we choose to address Mr. Medina's argument on the merits. *See, e.g.*, *United States v. Wells*, 873 F.3d 1241, 1250 (10th Cir. 2017) ("We need not opine on the waiver issue because we conclude that, in any event, Defendants-Appellants' recusal-based argument for a new trial fails on the merits."); *United States v. Black*, 773 F.3d 1113, 1115 n.2 (10th Cir. 2014) ("Because Black's SORNA claim fails on the merits, this court exercises its discretion to bypass the relatively complex waiver issue and resolve Black's appeal on the merits.").

explanation about the "insufficiency and limitation of surveillance" where the affidavit explained that "visual surveillance, however successful, cannot do much to establish the relationships between the investigation's subjects, the structure of their organization, the purposes of meetings, or the sources of their drug supply").

### b. Mobile surveillance

Mr. Medina's mobile surveillance argument is also unavailing. The affidavits reflect that investigators attempted to conduct mobile surveillance but were continuously thwarted. For instance, the TT1 affidavit stated that investigators could not conduct mobile surveillance due to the targets' "evasive driving" and "situational awareness." ROA, Vol. 1 at 364-66.

The TT5 affidavit described investigators' efforts to conduct mobile surveillance of Mr. Medina. On April 1, 2022, after intercepting a phone call in which Mr. Piedra-Gutierrez and Mr. Medina agreed to meet at Mr. Piedra-Gutierrez's house, investigators set up surveillance at the house. They observed Mr. Medina arrive, enter the residence for approximately 15 minutes, and then leave. The TT5 affidavit said that Mr. Medina drove away at "a high rate of speed, which prevented surveillance from following him." *Id.* at 694. A week later, investigators followed Mr. Medina to an address that he frequented. They observed Mr. Medina leave the apartment complex, enter his vehicle, and "look around" before driving away. *Id.* at 726. Agent Lievers stated this was a known "tactic to detect law enforcement surveillance," so investigators chose not to follow Mr. Medina to avoid detection. *Id.*

Later that month, investigators observed Mr. Medina participate in a suspected drug transaction.  When Mr. Medina drove away, he made several "burn runs,"[4] a tactic used to detect law enforcement surveillance.  *Id.*  Investigators continued to surveil Mr. Medina from May 10 to May 22, 2022, during which he made several more burn runs.  The affidavit explained that, as a result of Mr. Medina's "situational awareness for law enforcement surveillance, law enforcement was unable to further identify members of this DTO or known associates."  *Id.* at 727.[5]

---

[4] The TT5 affidavit explained that "[a] 'burn run' is a term used by law enforcement to describe maneuvers that are conducted by narcotics traffickers to evade and identify surveillance by law enforcement while operating motor vehicles." ROA, Vol. 1 at 727.

[5] Mr. Medina briefly notes that the investigators failed to employ other traditional investigatory techniques like search warrants and interviews.  Aplt. Br. at 28.

But Agent Lievers explained that search warrants would not further the goals of uncovering the scope and structure of the DTO and would only implicate those on the premises.  ROA, Vol. 1 at 368, 731; *see Verdin-Garcia*, 516 F.3d at 891 (stating that "the wiretap applications adequately explained" that search warrants "would not lead to the identity of all the members of the Target Organization nor the full scope of its drug trafficking activities"); *see also Castillo-Garcia*, 117 F.3d at 1193 (holding "reasonable" the Government's explanation for not using search warrants that it did not want to alert suspects to the existence of ongoing investigation).

In the TT5 affidavit, Agent Lievers also discussed investigators' attempts to interview Mr. Serrano-Vargas, a suspected DTO member, and Mr. Rojo-Salas, neither of whom provided helpful information.  ROA, Vol. 1 at 733-34.  Both the TT1 and TT5 affidavits also explained that attempting to interview the wiretap targets could jeopardize the investigation.  *Id.* at 369-71, 734; *see Verdin-Garcia*, 516 F.3d at 891 (finding an affidavit's explanation that further interviews of DTO members "could possibly jeopardize the investigation" sufficient (quotations omitted)).

Contrary to Mr. Medina's arguments, Agent Lievers's explanation for the investigators' lack of mobile surveillance was not a mere generality. According to the affidavits, Mr. Medina and other DTO members repeatedly took steps to detect and evade law enforcement, rendering mobile surveillance difficult and unlikely to succeed. *See Zapata*, 546 F.3d at 1186 (holding the Government's explanation that intercept targets were "extremely surveillance conscious" and "lived in an affluent neighborhood where surveillance was usually not possible" sufficient to demonstrate surveillance would not be successful).

Mr. Medina relies on *Castillo Garcia* to support his generality argument, but his reliance is misplaced. *See* Aplt. Br. at 28, 33. In that case, we held an officer's sworn statement that "a variety of normal and routine investigative techniques have been attempted during this investigation" was insufficient to show necessity. 117 F.3d at 1193-94. We explained that the statements supporting necessity "must specifically relate to the individuals targeted by the wiretap," *id.* at 1188, and noted that there was no language in the wiretap application at issue that was "in any way particularized to [the target]," *id.* at 1194. Absent such evidence, there was no reason to conclude that normal investigative procedures would be unsuccessful "if tried against [the target]." *Id.* at 1195. Here, by contrast, Agent Lievers's affidavits offered particularized explanations of the traditional investigative methods employed against the targets of the TT1 and TT5 wiretaps and detailed reasons as to why each investigative procedure fell short.

\*    \*    \*    \*

In sum, Mr. Medina's arguments about the investigators' failure to employ other methods of investigation and his criticism of the affidavits' explanation about the limitations of these techniques are not persuasive and do not undermine the district court's finding of necessity.

## III.  CONCLUSION

Both the TT1 and TT5 affidavits provided "full and complete statement[s]" as to the investigative techniques that "ha[d] been tried" and why they were insufficient to meet the investigation's goals.  *Foy*, 641 F.3d at 464 (quoting 18 U.S.C. § 2518(1)(c)).  They also explained, "with particularity," why other traditional techniques were unlikely to succeed.  *Cline*, 349 F.3d at 1280.  The district court, therefore, did not abuse its discretion in concluding that the Government made a sufficient showing of necessity and in denying the motion to suppress.[6]

---

[6] *See Barajas*, 710 F.3d at 1107 ("In each affidavit, [the affiant] explains why traditional investigative techniques—e.g., confidential sources and visual surveillance—were ineffective and why other techniques . . . would prove ineffective if tried. We have upheld wiretaps on similar showings." (citing *Foy*, 641 F.3d at 464; *Zapata*, 546 F.3d at 1187; *Verdin-Garcia*, 516 F.3d at 890-92)); *see also Portillo-Uranga*, 28 F.4th at 173-76.

We therefore affirm.

Entered for the Court


Scott M. Matheson, Jr.
Circuit Judge